In the Supreme Court of Georgia

Decided:   September 12, 2016

S16A1210.  DALLOW v. DALLOW.

NAHMIAS, Justice.

This appeal arises from the appellee mother's complaint for modification of the divorce parenting plan for her now-17-year-old child.  The appellant father contends that the trial court erred in denying his motion to dismiss the modification action, impermissibly modified his visitation rights to require him to arrange visits with his daughter at times that are mutually agreeable, and improperly awarded the mother $46,593.05 in attorney fees and costs.  Aside from what we conclude is a scrivener's mistake in the order awarding attorney fees, we see no error.  Accordingly, we affirm.

1.     The pertinent facts and convoluted procedural history of this case and the related contempt proceedings will take a number of pages to lay out.

(a)    Joel A. Dallow (Father) and Mary Ellen Kelly (Mother) married in August 1994 and had three children together:  Cecily, Eric, and the

child at issue in this case, J.D. Father is a musician with the Atlanta Symphony Orchestra, and Mother is an emergency room nurse at Northside Hospital. In January 2014, Father filed a complaint for divorce, and Mother answered and counterclaimed for divorce. The parties entered into a settlement agreement and prepared an agreed parenting plan, proposed child support worksheet, and consent child support addendum. On April 23, 2014, the trial court entered a final judgment and decree of divorce incorporating the parties' agreements and proposals. When the decree was entered, Cecily was an adult and in college; Eric was 17 and about to graduate from high school and go away to college; and J.D. was 14. The parties were awarded joint legal custody of Eric and J.D., with Mother given final decision-making authority regarding their non-emergency healthcare, extracurricular activities, education, and religious upbringing.

Mother was awarded the marital residence, which is in walking distance of J.D.'s high school. The agreed parenting plan incorporated into the divorce decree designated Mother as Eric and J.D.'s primary physical custodian. As for visitation, the plan said:

> Due to the fact that Eric will graduate high school in May 2014, and that [J.D.] is over the age of 14, [Father] will have parenting time at any time mutually agreeable to [Father] and each minor child. To

2

the extent that [Father] and [J.D.] cannot agree to more time, this Parenting Plan is the minimum time [Father] will have with [her]. [Father] shall have the minimum parenting time each week with [J.D.]: if he is not working on Sunday, his parenting time starts at 12:00 noon on Sunday, and if he is working, his parenting time starts at 6:00 p.m. on Sunday continuing until Wednesday morning to drop [J.D.] off at school, or at 9:00 a.m. when school is not in session.

There was also a holiday and school break visitation schedule.

The parenting plan acknowledged the logistical challenges inherent in raising busy teenagers who have extensive time commitments in addition to school. The parties agreed to "exchange the children at school when possible," but "[i]f the children are not in school or exchange at school is not practicable," Father was ordered to "pick up the children from [Mother and] . . . drop the children off with [Mother] at the end of his . . . visitation period." Under the heading "Other Parenting Time Provisions/Agreements," the plan listed several optional provisions, including the following one that was checked by the parties:

The parties agree that strict compliance with time and schedules set forth herein will not always be possible and agree to cooperate with each other in connection therewith. Both parties agree to exercise the parenting time/visitation schedule as set forth herein so as not to unreasonably interfere with [J.D.'s] schooling and extracurricular activities. . . .

The parties did not check the option to require both parents to "consult with

3

each other prior to scheduling any activity that will impact time the other parent spends with the child(ren)."

(b)    In May 2014, Father bought a house three miles from the marital residence. In June, J.D. threw an unauthorized party at Father's new house while he was out of town, which resulted in what Father characterized as some minimal property damage. Two watches with sentimental value to Father also went missing, along with an iPhone charger, several pieces of a ratchet set, and two vegetarian pizzas. J.D.'s conduct damaged her parents' trust in her. Mother grounded J.D. for the rest of the summer. Father was very upset. He demanded that she give him the names of the other children at the party so that he could call their parents, and when J.D. resisted, he threatened to call the police on her. This threat greatly disturbed her. Father hounded J.D. to help him find out who took the missing items; after a few days, the level and constancy of Father's anger and yelling at J.D. made her scared to be alone with him, so on Father's Day she visited him with her older brother Eric. J.D. eventually gave Father the other children's names, and he contacted their parents. At the end of the summer, Eric moved to North Carolina to start college.

4

During the summer of 2014, the amount of time that Father requested for visitation with J.D. was far less than the minimum parenting time specified in the divorce decree. Nevertheless, towards the end of the summer, Father reviewed the parenting plan and began threatening J.D. that he would take her and Mother to court if J.D. did not abide by the minimum visitation schedule. The atmosphere of mistrust and resentment created by the party and its aftermath, and Father's demanding approach in asserting his visitation rights, made J.D. increasingly reluctant to stay with him. J.D. proposed to Father that she have visitation with him every other weekend, which would keep her from having to divide her time between two households during the school week, but Father rejected her proposal out of hand.

(c) On August 11, 2014, J.D.'s first day of tenth grade, Father filed, in the divorce action, a pro se petition for contempt against Mother. He alleged among other things that Mother had denied him visitation with J.D. by "allow[ing] the minor child to be unavailable for pick up at the designated times in the Parenting Plan," by permitting J.D. to make plans during his visitation time, and by failing to encourage J.D. to stay in touch with him and to keep him informed about what was going on in her life. Father requested among other

5

things that Mother be jailed, that he be given "make up" visitation time with J.D., and that the court order that J.D. undergo therapy with a clinical social worker or psychologist chosen by Father.

In September 2014, the Atlanta Symphony Orchestra locked out its musicians in a labor dispute that lasted for the next two months, and between the end of September and the middle of November, Father missed six weeks of visitation with J.D. Father's explanation was that he could not exercise any visitation because he was working various jobs out-of-state.

Meanwhile, on October 3, 2014, Mother filed a complaint for modification of Father's visitation rights as a civil action separate from the divorce action in which Father had filed his contempt petition. Supported by an affidavit by J.D. expressing her preference not to be forced to visit Father, the modification complaint alleged that J.D. was never consulted before the divorce about her wishes concerning visitation, that she found the split-week arrangement to which the parties had agreed highly objectionable during the school year, and that the inconvenient arrangement had caused her significant stress and emotional hardship and had significantly damaged her quality of life. The complaint requested that the parenting plan be modified so that J.D. would be

6

required to visit Father only on days and times that are mutually agreeable to both of them.

On November 4, 2014, Father filed a motion to dismiss Mother's modification complaint, which he amended five times over the next seven months. On November 18, Mother, acting through counsel, accepted service of Father's contempt petition, and on December 1, she filed her answer, denying that she had willfully violated the divorce decree. Mother alleged that she had been and would continue on a daily basis to actively encourage J.D. to see Father and to keep him informed about what was happening in her life, adding that she had urged J.D. to work with Father to devise a visitation schedule that worked for both of them.

On December 3, 2014, Father filed a pro se amendment to his contempt petition and a motion to modify the parenting plan to increase his minimum visitation time with J.D. Father alleged that Mother was continuing to interfere with his visitation time and blamed Mother for creating "a sense of estrangement and alienation" between him and J.D. Father asked the court to modify the parenting plan to award him, as "make up" visitation with J.D., "all holidays and school breaks in 2015, with the exception of Mother's Day and Christmas Day

7

until 1:00 p.m.," and double summer vacation time of four weeks. Father also asked the court to modify the "Other Parenting Time Provisions/Agreements" section

> to require [Mother] to offer [Father] the right of first refusal of supervision, transportation, or other care and custody of [J.D.] prior to making any arrangements for the child to be in anyone else's care, custody or supervision, regardless of the amount of time; and . . . by checking the box that requires parents to confer with each other prior to scheduling any activity that impacts the time the other parent has with the child, including a specific direction to [Mother] that she is not permitted to schedule anything for the minor child, or allow the minor child to schedule anything[,] that conflicts with [Father's] court-ordered minimum visitation and parenting time.

In early January 2015, during Father's first visitation with J.D. after the holiday school break, he sat her down and read her the 12-page parenting plan verbatim, which made her cry. J.D. was so upset that she contacted her brother Eric and asked him to come pick her up. According to Father, J.D.'s attitude towards him changed after this incident and continually deteriorated after that.

On January 27, 2015, the trial court held a hearing on Father's amended contempt petition, at which he was represented by a Virginia attorney appearing pro hac vice. On February 12, the court entered a final order finding Mother in contempt in several respects related to the property division provisions of the

8

divorce decree. The court expressly rejected, however, Father's assertion that Mother was the source of the disruption of his visitation with J.D. and the deterioration of their father-daughter relationship, and therefore declined to hold Mother in contempt on this issue. The court did grant Father's request to order Mother to refrain from scheduling any activity for J.D. during Father's visitation time and directed Mother to admonish J.D. that any activity scheduled during that time must be cleared with Father.

(d)     On February 16, 2015, J.D. informed Father that she wanted to stay at home that night and told him by text message not to pick her up after dance class. Father responded that he was going to pick J.D. up despite her wishes, so she asked Mother to pick her up early from dance class, which Mother then did. When Father learned that J.D. had left early, he called the police and drove to Mother's house, where he showed the police the parenting plan giving him visitation with J.D. that evening and then waited in his car while the police went inside and spoke with Mother and J.D. The police told J.D. that they would arrest Mother if J.D. did not go with Father, so she went to his house to spend the night. J.D. was extremely upset at Father for calling the police and for forcing her to go with him that night against her wishes.

Throughout the school year, Father insisted that J.D. ride the bus to school some mornings during his visitation time even though he was home and available to drive her. On those mornings, he would not let J.D. ride to school with a friend, and although he sometimes allowed Mother to pick J.D. up from his house and drive her to school, at other times he would refuse. Father's initial explanation for his periodic refusal to take J.D. to school was that he could not spare the 30 to 60 minutes it allegedly took him to do so. However, he also said, "if [J.D.] wants me to go out of my way, she needs to start treating me with respect." Father later claimed that having to ride the bus "builds character." It infuriated J.D. to be forced to ride the bus to school when Father was available but unwilling to take her and unwilling to allow her to get a ride to school, but despite the friction that this issue caused in their relationship, Father would not relent.

On the morning of March 17, 2015, J.D. had arranged with Mother to pick her up at Father's house and take her to school, apparently with Father's consent, but J.D. overslept and Mother had to go on to work. When Father noticed that J.D. was not up, he woke her and told her that she needed to get ready for the bus. J.D. did not have clean clothes to wear to school and was

upset that Mother was already at work and could not pick her up and take her home to change clothes before school. Father was unmoved and insisted that J.D. take the bus to school in her dirty clothes, because he had "told [J.D.] repeatedly, pack what you need for the half week so that you have what you need for school."

J.D., crying hysterically, called a friend whose mother then picked her up from Father's house, took her home so that she could put on clean clothes, and then drove her to school. When Father discovered that J.D. did not take the bus, he assumed that she had caught a ride to school, but he nevertheless contacted the police and had them call J.D., who was at home changing for school. Father also contacted the woman who picked J.D. up and threatened legal action against her if she ever gave J.D. a ride to school from his house again. J.D. was extremely upset that Father had called the police on her again.

On April 27, 2015, Father filed another contempt petition, alleging among other things that Mother had interfered with his visitation in various ways. On May 19, Father filed another contempt petition, this time alleging that Mother failed to foster his father-daughter relationship with J.D., failed to confer with him when choosing a therapist for J.D., told J.D. that Father was requiring her

11

to go to therapy, and refused to consent to therapy for J.D. with a parental alienation specialist chosen by Father. On June 2, Father filed yet another contempt petition, alleging that Mother instructed J.D. to forward to her a visitation-related email from Father and failed to turn over to the trial court all communications between Mother and J.D. as he requested. On June 3, Mother responded to Father's contempt motions, denying his allegations and asserting that he was being uncooperative and unreasonable.

(e) On June 4, 2015, the trial court held a lengthy hearing on "everything" pending in both the modification of visitation and divorce contempt cases. Father, Mother, one of Mother's neighbors, and the woman who gave J.D. a ride to school on March 17 testified, and the parties introduced voluminous written communications among Father, Mother, and J.D. It was undisputed that J.D. hated the forced visitation schedule with Father and that she actively resisted going to see him. The evidence showed that when J.D. stayed at Father's house, she locked herself in her bedroom for the duration of the forced visits; she refused to eat his food; and when Father put up pictures in her bedroom of them together when she was younger, she took the pictures down, explaining to Father that she did not want to look at them. Father denied any

12

responsibility for the difficulties in his relationship with J.D. and her desire not to have forced visitation with him, attributing the problems entirely to Mother's alleged efforts to alienate him from J.D. The parties agreed at the hearing to present closing arguments and motions for attorney fees by briefs, which the parties then filed on June 15. On July 1, 2015, the trial court entered an order granting Mother's complaint for modification of visitation; on July 6, the court entered an order awarding Mother $46,593.05 in attorney fees; and on July 7, the court entered an order denying Father's motion to dismiss Mother's complaint.[1]

In the modification order, the trial court found that J.D. was living "a life full of stress, anxiety and turmoil" as a result of the inconvenient visitation arrangement established by the divorce decree. The court noted its opportunity to observe Father's demeanor and found that he was "convinced that he could have a 'father-daughter relationship' by force" and was "out of touch with the depth and severity of his daughter's anger and resentment." In the attorney fees

---

[1] On July 1, the trial court also entered an order on Father's contempt petitions, finding Mother in contempt in several respects related to visitation, and on July 6, the court entered an order granting Father $5,732.80 in attorney fees related to his contempt petition resolved by the February 12, 2015 contempt order.

13

order, the court rejected Father's claim that Mother was "systematically alienating" J.D. from him, finding instead that "Father's behavior was a huge contributor" to the breakdown of his relationship with J.D., that he had "wielded his 'I'm the boss of you' father card over the child like a sledge hammer in spite of his fragile relationship with her," and that "throughout Father's testimony, he was clear that his support, love, attention, guidance and rearing of J.D. and her siblings would be on his terms and that would be revoked if his children did not behave exactly as he demands." The court also found that, despite his recognition that his relationships with all three of his children were strained, Father "nonetheless still travel[ed] the path to reconciliation via threats, numerous court filings, and repeated police involvement."

The court noted that it had "seriously considered" ordering reunification therapy for Father and J.D. until "it became obvious" that such a requirement "would likely be a waste of time and money and a source of more frustration" given the level of J.D.'s anger towards Father. The court therefore granted Mother's request to modify the parenting plan to require J.D. to visit Father only at times they mutually agree on, thereby eliminating the visitation by "force and intimidation" that was driving Father and J.D. further and further apart.

14

On the issue of attorney fees, the trial court found that Father "turned a simple litigation into a complex one" with numerous court filings and abusive discovery requests and by threatening Mother with criminal prosecution for misdemeanor interference with child custody and arrest from her job in connection with a settlement proposal that would have required her to pay his attorney $55,000. The court ordered Father to pay Mother $46,593.05 in fees, in monthly increments of $5,000.

On July 28, 2015, Father filed a timely notice of appeal to this Court, specifying that he was challenging the orders granting Mother's modification complaint, awarding Mother attorney fees, and denying his motion to dismiss.[2]

2. Before we consider Father's enumerations of error, we address this Court's jurisdiction to decide this appeal. See Lay v. State, 289 Ga. 210, 211

---

[2] Father's notice of appeal directed the trial court clerk to omit from the appellate record "all portions of the transcribed hearing on January 27, 2015" and "all portions of the hearing on June 4, 2015 after argument of the motions to dismiss . . . up until the few final minutes of the hearing when attorney's fees were discussed." The record on appeal does not contain a transcript of the January 27 hearing, although it contains a full transcript of the June 4 hearing. The notice of appeal, which Father also filed in his divorce contempt action against Mother, contained the case style and trial court case number of both his divorce contempt action and Mother's modification action. Records in each action were forwarded to this Court, where the two appeals were initially docketed as a single Case No. S16A1210. On April 21, 2016, this Court entered an order splitting out Father's appeal in his contempt action, which was then docketed as Case No. S16A1354, leaving this appeal from the modification action as Case No. S16A1210. Oral argument was held on July 11, 2016.

15

(710 SE2d 141) (2011) ("'[I]t is the duty of this Court to inquire into its jurisdiction in any case in which there may be a doubt about the existence of such jurisdiction.'" (citation omitted)).  Under the current scheme of appellate court jurisdiction, this Court has subject matter jurisdiction over appeals in "[a]ll divorce and alimony cases."  Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (6).  An appeal from any judgment other than a final judgment and decree of divorce that involves only issues of child custody (including visitation rights) falls within the jurisdiction of the Court of Appeals.  See Carter v. Foster, 247 Ga. 26, 26 (273 SE2d 614) (1981); Munday v. Munday, 243 Ga. 863, 864 (257 SE2d 282) (1979).

However, an award of attorney fees under OCGA § 19-6-2 is an "intrinsic part of temporary alimony," as its purpose is to enable the recipient party to contest all issues in the pending action for alimony, divorce and alimony, or contempt of court arising out of an alimony or a divorce and alimony case.  Scott v. Scott, 251 Ga. 619, 620 (308 SE2d 177) (1983).  Thus, an appeal challenging an award of attorney fees under § 19-6-2 qualifies as a "divorce and alimony case[]" that falls within this Court's current subject matter jurisdiction.  See Tucker v. Tucker, 164 Ga. App. 477, 477 (298 SE2d 159) (1982) (physical

16

precedent only).  See also, e.g., <u>Haim v. Haim</u>, 251 Ga. 618, 618 (308 SE2d 179) (1983).  Although we ultimately agree with Mother's argument that the trial court's reference to § 19-6-2 was a mere scrivener's error and that the court actually based the award on OCGA § 9-15-14, see Division 5 below, that argument goes to the merits of Father's claim and does not alter our jurisdictional analysis.  Accordingly, this appeal invokes – if only barely – this Court's subject matter jurisdiction.

We note, however, that during this year's legislative session, the General Assembly passed, and the Governor then signed into law, the Appellate Jurisdiction Reform Act of 2016, Ga. L. 2016, p. 883, which gives the Court of Appeals subject matter jurisdiction over "[a]ll divorce and alimony cases" in which a notice of appeal or application to appeal is filed on or after January 1, 2017.  Id. § 3-1 (codified at OCGA § 15-3-3.1 (a) (5)).  Thus, appeals in future cases of this sort will go to the Court of Appeals instead of this Court.  See <u>Williford v. Brown</u>, 299 Ga. 15, 16-17 & n.1 (785 SE2d 864) (2016) (recognizing that the need for Georgia's appellate courts and litigants to engage in many intricate jurisdictional analyses of this sort will soon begin to dissipate).

We can now turn to Father's enumerations.

17

3. Father contends first that OCGA §§ 19-9-23 and 19-9-24 required the trial court to dismiss Mother's October 2014 complaint for modification of his visitation rights. We disagree.[3]

(a) In 1977, this Court noted its concern about

the number of cases in which children are illegally seized or illegally detained at the end of visitation periods by their noncustodial parents, as well as those where a parent is personally served with a petition when he arrives to return his children home, as in this case. We believe that by denying these parents a convenient forum in which to relitigate custody, these practices may be reduced or stopped altogether. It is thus in the public interest to discourage such conduct without any prejudice whatsoever to the noncustodial parent's right to bring such a petition where the legal custodian, and the children, reside.

Matthews v. Matthews, 238 Ga. 201, 203 (232 SE2d 76) (1977). The following year, the General Assembly responded to this problem by enacting the Georgia Child Custody Intrastate Jurisdiction Act of 1978, Ga. L. 1978, p. 1957 ("CCIJA"), and Georgia's version of the Uniform Child Custody Jurisdiction Act, Ga. L. 1978, p. 258 ("UCCJA"). See Sweeney v. Sweeney, 241 Ga. 372,

---

[3] Father also contends that the trial court erred in denying his motion to dismiss because Mother "did not timely oppose" the motion. Father cites no authority in support of this contention. In fact, there is no requirement that a motion to dismiss be granted, without regard to its merits, simply because no response was filed. See Cogland v. Hosp. Auth. of Bainbridge, 290 Ga. App. 73, 76 (658 SE2d 769) (2008) ("'[T]here is no such thing as a default judgment on the pleadings.'" (citation omitted)).

374-375 (245 SE2d 648) (1978) (plurality opinion). The CCIJA is codified at OCGA §§ 19-9-20 to 19-9-24.[4]

(b) We first consider OCGA § 19-9-23.[5] Subsection (a) requires that any complaint seeking to change which parent has the majority of parenting time must be brought as a separate action in that primary physical custodian's county of residence.[6] Subsection (b) requires that any complaint by the primary

---

[4] In 2001, the General Assembly replaced the UCCJA with Georgia's version of the Uniform Child Custody Jurisdiction and Enforcement Act or UCCJEA, Ga. L. 2001, p. 129 (codified at OCGA §§ 19-9-40 to 19-9-104).

[5] OCGA § 19-9-23 says in full:

(a) Except as otherwise provided in this Code section, after a court has determined who is to be the legal custodian of a child, any complaint seeking to obtain a change of legal custody of the child shall be brought as a separate action in the county of residence of the legal custodian of the child.

(b) A complaint by the legal custodian seeking a change of legal custody or visitation rights shall be brought as a separate action in compliance with Article VI, Section II, Paragraph VI of the Constitution of this state.

(c) No complaint specified in subsection (a) or (b) of this Code section shall be made:

(1) As a counterclaim or in any other manner in response to a petition for a writ of habeas corpus seeking to enforce a child custody order; or

(2) In response to any other action or motion seeking to enforce a child custody order.

(d) The use of a complaint in the nature of habeas corpus seeking a change of child custody is prohibited.

[6] The term "legal custodian" as used in the CCIJA means, "[w]here custody of a child is shared by two or more persons or where the time of visitation exceeds the time of custody, that person who has the majority of time of custody or visitation." OCGA § 19-9-22 (2). To avoid confusion with the term "legal custodian" as used in other areas of family law, we will refer to the CCIJA legal custodian as the "primary physical custodian."

19

physical custodian seeking a change in custody or a change of the other parent's visitation rights also must be brought as a separate action, but in the other parent's county of residence. Subsections (c) and (d) then prevent litigants from evading the pleading and venue strictures of subsections (a) and (b) through the procedures for habeas corpus, see OCGA §§ 9-14-1 to 9-14-23, or by invoking provisions of the Civil Practice Act that allow or require aggregation of claims involving the same parties or general subject matter, see, e.g., OCGA § 9-11-13 (counterclaims).

Father relies on § 19-9-23 (c) (2), which prohibits a complaint seeking to obtain a change of visitation rights from being made "[i]n response to any [non-habeas corpus] action or motion seeking to enforce a child custody order." Pointing to the contempt petition that he filed in the divorce action in August 2014, seeking to enforce the parties' child custody order – in particular, the minimum visitation schedule in the parenting plan – Father argues that Mother's complaint for modification of his visitation rights, which she filed two months later, was impermissibly made "[i]n response to" his contempt action. Mother's modification complaint may have been prompted, at least in part, by Father's filing of his contempt petition against her, but OCGA § 19-9-23 is not

20

concerned with the motivations behind the proceedings it addresses.

Rather, the statute regulates how and where complaints to change custody (and visitation) may be pursued, and Mother did not file her modification action as a responsive pleading or counterclaim in Father's divorce contempt action. Instead, she did exactly what § 19-9-23 (b) required her to do to obtain modification of Father's visitation rights: she filed a "complaint . . . seeking a change of . . . [his] visitation rights . . . as a separate action" in Father's county of residence "in compliance with Article VI, Section II, Paragraph VI of the Constitution," which generally requires civil cases to be venued "in the county where the defendant resides." See Jones v. Jones, 256 Ga. 742, 743 (352 SE2d 754) (1987) ("The custodial parent, in this case the mother, sought to have the father's visitation rights modified and brought a separate action in the county of residence of the father, the noncustodial parent. This was proper under OCGA § 19-9-23 (a).")[7]; Alberti v. Alberti, 320 Ga. App. 724, 728 (741 SE2d 179) (2013) (holding that a father's petition to change custody was not barred by § 19-9-23 (c) (1) even though it was "predicated on the [m]other's successful

[7] While Jones refers to § 19-9-23 (a), the mother in that case was clearly the primary physical custodian, so the reference should have been to subsection (b). Like trial courts, see Division 5 below, this Court makes the occasional scrivener's error.

21

petition for habeas corpus," because it was properly filed as a separate action in the mother's county of residence).

Indeed, not long after the CCIJA was enacted, this Court encouraged parents to follow the course that Mother pursued in order to obtain a change of primary physical custody or visitation rights following efforts by the other parent to enforce the existing child custody order. See Hutto v. Hutto, 250 Ga. 116, 118 (296 SE2d 549) (1982) (explaining that a father with visitation rights who was prevented by what is now § 19-9-23 (c) (1) from filing a counterclaim seeking a change of custody in response to the mother's petition for habeas corpus filed in father's county of residence was not without recourse, as he could file a separate complaint seeking a change of custody in the mother's county of residence). In short, OCGA § 19-9-23 governs how and where an action seeking a change of primary physical custody or visitation rights must be filed, not whether such an action can be filed at all when a child custody enforcement action by the other parent is pending. Thus, § 19-9-23 did not require the trial court to grant Father's motion to dismiss.

(c)    We turn next to OCGA § 19-9-24.[8]    Father relies on subsection (b), which says that the primary physical custodian shall not be allowed to "maintain" a civil action for, among other things, change of visitation rights for "*so long as* visitation rights *are withheld* in violation of the custody order." (Emphasis added.)  Subsection (a) contains a reciprocal bar preventing a parent with visitation rights from maintaining a civil action for change of custody for "*so long as* custody of the child *is withheld* from [the primary physical custodian] in violation of the custody order."  See Hutto, 250 Ga. at 117 (holding that it was error to allow a father to maintain an action for change of custody "even though he was withholding custody of the child from the mother . . . in violation of the custody order").

In his brief to this Court, Father asserts that the trial court found that

---

[8]  OCGA § 19-9-24 says in full:

(a)    A physical custodian shall not be allowed to maintain against the legal custodian any action for divorce, alimony, child custody, change of alimony, change of child custody, or change of visitation rights or any application for contempt of court so long as custody of the child is withheld from the legal custodian in violation of the custody order.

(b)    A legal custodian shall not be allowed to maintain any action for divorce, alimony, child custody, change of alimony, change of child custody, or change of visitation rights or any application for contempt of court so long as visitation rights are withheld in violation of the custody order.

23

Mother had "withheld visitation," referring to the court's February 12 and July 1, 2015 contempt orders. That is not true. In its February 12 contempt order, the trial court specifically declined to find that Mother violated the divorce decree with respect to Father's visitation with J.D. And in its July 1 contempt order, the court found that Mother violated the divorce decree by *interfering* with Father's visitation on a few occasions, not that she was *withholding* visitation from him altogether. Father's not receiving his full scheduled visitation on a particular occasion does not equate to a finding that Mother was affirmatively precluding him from visitation with J.D. Indeed, Mother testified at the June 4, 2015 hearing that she had never withheld visitation from Father and offered text messages from J.D. stating that Mother did not prevent any visits with Father, and the trial court was entitled to credit that evidence. Compare Avren v. Garten, 289 Ga. 186, 187 (710 SE2d 130) (2011).[9] Thus, the trial court also did not err in declining to dismiss Mother's modification

[9] We have some doubt about our indication in Avren that past instances of withholding, rather than withholding of custody or visitation at the time that the trial court is deciding how to proceed in the newly filed action, would bar the new action under OCGA § 19-9-24 (b). But we need not resolve that issue to decide this case, as the record evidence here is factually quite distinct from the record in Avren, where the evidence showed that the father's scheduled visitation with a child under age 14 had not taken place on over 100 dates in an eight-month period, the mother admitted impeding visitation, and "the trial court found at the hearing that [the mother] had withheld visitation." Avren, 289 Ga. at 187.

24

complaint pursuant to OCGA § 19-9-24 (b).

4. Father claims that the trial court erred in modifying his visitation rights to require him to arrange visitation with J.D. at times that are mutually agreeable. In a dispute between two fit parents,

> "[a] trial court faced with a petition for modification of child custody is charged with exercising its discretion to determine what is in the children's best interest. A trial court's decision regarding a change in custody/visitation will be upheld on appeal unless it is shown that the court clearly abused its discretion. Where there is any evidence to support the trial court's ruling, a reviewing court cannot say there was an abuse of discretion."

Coppedge v. Coppedge, 298 Ga. 494, 499 (783 SE2d 94) (2016) (citation omitted).

Father first seeks to avoid this daunting standard of appellate review by demanding a do-over in the trial court, claiming that his due process rights were violated because "there was no trial on [Mother's complaint] for modification." This claim is belied by the record. On June 4, 2015, the trial court held an evidentiary hearing on "everything" pending in both the modification and contempt cases, which included Mother's October 2014 complaint for modification of Father's visitation rights; the court had sent counsel for both parties an email, listing both the modification and contempt case numbers, "to

25

confirm that the final trial in both of these cases has been specially set for June 4, 2015," and Father referenced the June 4 trial date in both his pre-hearing and post-hearing filings in the modification action. Moreover, at the hearing the parties presented not only evidence on the specific contempt claims that Father had raised but also extensive evidence on the need for modification of the existing parenting plan, including the testimony of both parties and voluminous written communications among Father, Mother, and J.D.

Turning to the merits of the modification ruling, Father contends that the trial court failed to consider whether modification was in J.D.'s best interests and whether some remedy other than requiring Father to arrange visitation with his then-almost-16-year-old daughter at mutually convenient times would be more appropriate. In particular, Father points to his request for mandatory reunification therapy with J.D., but the court explained in its order that it "seriously considered" that request until "it became obvious to the Court that, given the level of J.D.'s anger, this would likely be a waste of time and money and a source of more frustration." Father disputes the trial court's factual findings and asserts – with no apparent basis other than his displeasure with the court's ruling – that "the court ignored evidence" in his favor that was presented

26

at the hearing.

Father claims that the "court found [Mother] engaged in an incessant pattern of contemptuous interference with visitation even after the court told her to stop." In reality, while recognizing that Mother is "not without fault," the court found that the acts she had committed in contempt of the court's orders were done "in order to assist the child in navigating this difficult situation [with Father]" and that she "has been trying unsuccessfully to find ways to support a troubled child while at the same time avoiding contempt of the Court's Orders." Father also repeatedly mischaracterizes the trial court's ruling that he must arrange his visitation with his now-17-year-old daughter at mutually convenient times as a "termination of [his] parenting time." Instead, Father may actually spend more time with J.D. than he did under the previous plan – if he treats her with sufficient respect and kindness that she is willing to be with him and thereby alleviates what the court "sadly" found to be J.D.'s "significant stress and emotional hardship resulting from the [previous] inconvenient visitation arrangement." The record shows that the trial court did not seek to end J.D.'s relationship with her father, but rather to rejuvenate it by modifying a visitation scheme that the court found J.D. perceived to be based on Father's "force and

27

intimidation."

Ample evidence supported the court's modification of Father's visitation rights to change his time with J.D. to mutually agreed dates and times. See Andersen v. Farrington, 291 Ga. 775, 777 (731 SE2d 351) (2012) (recognizing the discretion of a trial court to "impose reasonable restrictions upon visitation as the circumstances may require," including preconditions to exercising visitation). Indeed, the modified visitation arrangement as to J.D. is the same "mutually agreeable" times arrangement to which Father agreed in the original parenting plan as to her brother Eric when he was about J.D.'s current age. See Doritis v. Doritis, 294 Ga. 421, 425 (754 SE2d 53) (2014) (upholding a trial court's exercise of discretion in determining that compelled counseling or visitation with a father would not be in the best interests of his 17-year-old child).

Finally, while the trial court's order does not use the term "best interests of the child," OCGA § 19-9-3 (a) (3), (5), there is no indication in the record that the trial judge – who has extensive experience with child custody matters – applied any other standard. Indeed, the court's order is squarely focused on what visitation arrangement is in J.D.'s – rather than her Father's – best

interests. See Davis v. Bushnell, 245 Ga. App. 221, 223 (537 SE2d 477) (2000) ("'In the absence of a contrary showing, the trial court will be presumed to have followed the law.'" (citation omitted)).

5. Father contends that the trial court denied him due process in awarding Mother attorney fees in the July 6, 2015 order because the award was made under an inapplicable statute. The three-page order said in conclusion, "Pursuant to OCGA Sec. 19-6-2, the Court hereby awards fees to the Mother for this modification action in the amount of $46,593.05." As Father correctly points out, this award was not proper under the statute cited, because OCGA § 19-6-2 authorizes an award of attorney fees only in an "action . . . for alimony, divorce and alimony, or contempt of court arising out of either an alimony case or a divorce and alimony case, including but not limited to contempt of court orders involving property division, child custody, and child visitation rights." OCGA § 19-6-2 (a). Mother's separate action to modify Father's visitation rights was not such a proceeding. Mother concedes this point, but she argues that the award should be affirmed because the trial court clearly meant to make the award pursuant to OCGA § 9-15-14 (b) and the reference in the order to § 19-6-2 was just a scrivener's error. We agree.

29

OCGA § 9-15-14 (b) authorizes the assessment of "reasonable and necessary" attorney fees and litigation costs in civil cases against a party that has "unnecessarily expanded the proceeding by . . . improper conduct, including . . . abuses of discovery procedures." Mother requested an award pursuant to OCGA § 9-15-14 (b) in multiple court filings in her modification case, including her post-hearing brief on attorney fees; she did not request fees under § 19-6-2. Furthermore, the order making the award contained findings that one would expect to see in an award made pursuant to § 9-15-14 (b). Specifically, the trial court found that Father "turned a simple litigation into a complex one" by, among other things, filing five motions to dismiss Mother's complaint for modification; sending Mother 517 requests to admit in this case and Father's divorce contempt case; requesting the appointment of a guardian ad litem six weeks before the trial was scheduled to start; threatening Mother with prosecution for criminal interference with custody and with arrest from her job; and making these threats in connection with a settlement proposal that would have required Mother to pay Father's lawyer $55,000.

Thus, while the trial court erroneously cited OCGA § 19-6-2, this clerical error does not require reversal of the attorney fees award. See Williams v.

30

Becker, 294 Ga. 411, 413 n.1 (754 SE2d 11) (2014) (rejecting the argument that reversal was required where the trial court purported to award attorney fees pursuant to "OCGA § 19-15-14" – a nonexistent statute – because a review of the record, including the trial court's order, showed that "the reference to OCGA § 19-15-14 was a scrivener's error" and that "the court clearly meant to cite OCGA § 9-15-14"). See also Viskup v. Viskup, 291 Ga. 103, 106 (727 SE2d 97) (2012) (explaining that this Court may review the record to determine the statutory basis of an attorney fees order).

Father also asserts that his due process rights were violated because the award was made without a written motion, without a hearing, and without any supporting evidence. However, the record shows that Mother repeatedly asked the trial court in written filings for an order awarding her attorney fees under OCGA § 9-15-14 and also made an oral request for fees at the June 4, 2015 hearing. See OCGA § 9-11-7 (b) (describing a "motion" as an "application to the court for an order . . . which, unless made during a hearing or trial, shall be made in writing"). And at the end of that hearing, during a discussion of the parties' dueling requests for attorney fees, the court asked: "The first question is, are we waiving a fee hearing? If not, we might as well go ahead and set that

and then if you want to do your closings on brief – I don't really care how you want to do it." Father's counsel replied, "I prefer closing on brief. . . . We'll do [a] brief on fees as well," and Mother's counsel said, "I'm fine with that." The parties then submitted briefs that included their arguments on the fees requests, and Mother's brief attached an affidavit by her attorney showing the attorney fees that Mother incurred supported by detailed billing records and asserting their reasonableness.[10] The court referenced those submissions in its fees order. We see no error. See Ellis v. Caldwell, 290 Ga. 336, 340 (720 SE2d 628) (2012) ("[A] party may waive an evidentiary hearing on a motion for attorney fees."). See also Windham v. Araya, 286 Ga. 501, 503-504 (690 SE2d 168) (2010) (recognizing that even an untimely affidavit may provide sufficient proof to support an award of attorney fees as long as the opposing party had an opportunity to respond before the order awarding fees was entered).

6. On July 7, 2016, more than two months after Father filed his initial brief on April 20, raising the enumerations of error addressed above, he filed a "Replacement Brief" attempting to raise three additional enumerations of error.

---

[10] Father's counsel also submitted an affidavit regarding her fees, but as a separate document.

Remarkably, Father filed this brief on the Thursday before the oral argument on Monday, July 11, and he did so despite this Court's entry of an order on July 5 denying the request he made earlier that day for permission to file a supplemental brief. This Court's rules require an appellant's brief to be filed within 20 days after the case is docketed, unless the Court grants an extension of time (which Father did not seek), and enumerations of error must be filed as a part of that brief. See Supreme Court Rules 10 and 19. See also OCGA § 5-6-40. Rule 24 permits the filing of a supplemental brief if a party is not seeking only to circumvent the page limits of Rule 20, but Rule 24 "is not a means by which a party may circumvent the requirement that enumerations of error be timely submitted." Willis v. Willis, 288 Ga. 577, 582 (707 SE2d 344) (2011). Accordingly, we will not consider the additional enumerations of error first raised by Father in his "Replacement Brief." See id.

Judgment affirmed. All the Justices concur.