310 Ga. 491
FINAL COPY

S20A1152.  BECK v. THE STATE.

PETERSON, Justice.

Dallas Jarvis Beck was convicted of felony murder and possession of a weapon during the commission of a crime in connection with the 2012 shooting death of Corey Liverpool. In Beck's previous appeal to this Court, we remanded the case for the trial court to review his claim that jurors considered extrajudicial information regarding sentencing. The trial court rejected that claim on remand, and Beck appeals again.[1] In addition to raising the

[1] The crimes occurred on August 26, 2012. On May 21, 2014, a Clayton County grand jury indicted Beck for malice murder, three counts of felony murder (predicated on aggravated assault, aggravated battery, and possession of a firearm by a felony first-offender probationer), aggravated assault, aggravated battery, possession of a weapon during the commission of a crime, and possession of a firearm by a felony first-offender probationer. The grand jury also indicted Lakeya Burroughs for simple battery and disorderly conduct. Beck was tried separately from July 7 to 11, 2014, and the jury found him guilty of all counts except malice murder. The trial court on July 17, 2014, sentenced Beck to life in prison with the possibility of parole for felony murder predicated on aggravated assault and five years to be served consecutively for possession of a weapon during the commission of a crime. The other two felony murder counts were vacated by operation of law, and the trial court purported

juror issue, Beck argues that the trial court erred by refusing to admit various evidence about the victim and by failing to charge the jury on voluntary manslaughter.[2] Because we defer to the trial court's finding that the testimony about juror misconduct was not credible, we conclude that the court did not abuse its discretion in rejecting Beck's juror misconduct claim. We also conclude that the trial court properly refused to give a jury instruction on voluntary manslaughter because no evidence supported it, and that any error by the trial court in limiting evidence about the victim was

---

to merge the remaining counts into the felony murder count on which Beck was sentenced. Beck filed a timely motion for new trial on July 18, 2014, and an amended motion on April 28, 2015. A hearing was held on April 25, 2017, and continued on October 10, 2017. The amended motion was denied on December 11, 2017. Beck appealed, and this Court vacated the trial court's denial of the motion for new trial and remanded the case in an opinion issued on March 4, 2019. See *Beck v. State*, 305 Ga. 383 (825 SE2d 184) (2019). In addition to determining that the trial court needed to revisit Beck's claim that he was entitled to a new trial due to juror misconduct, this Court determined that the evidence was constitutionally sufficient to support his convictions, and we declined to address any issue regarding the sentences given the State's failure to challenge them. See id. at 383 n.1, 384, 387. On January 3, 2020, the trial court again denied Beck's motion for new trial. Beck filed a timely notice of appeal, and the appeal was docketed to the August 2020 term of this Court and submitted for a decision on the briefs.

[2] Although Beck raised these issues in his prior appeal, we did not address them at that time. Instead, we concluded that, if the trial court did not grant Beck a new trial on remand, Beck would be able to raise the issues again in a subsequent appeal. See *Beck*, 305 Ga. at 383, 388 (2).

harmless. We affirm.

Our previous opinion summarized the trial evidence, viewed in the light most favorable to the jury's verdicts, as follows:

> On August 26, 2012, Beck and his girlfriend, Lakeya Burroughs, were both present in her apartment at various points throughout the day leading up to the shooting. That evening, two residents of the apartment complex, Grady Lamb and Valeriea Holiday, sat outside watching children and adults play basketball in the parking lot. Corey Liverpool and Burroughs's son were among those playing. During the game, Liverpool accidentally knocked Burroughs's son to the ground. The son then ran to Burroughs and told Burroughs that Liverpool, whom the son called "Uncle Killer," was outside.
>
> Burroughs grabbed Beck's pistol to confront Liverpool, but Beck took it from her before she left the apartment. Liverpool and Burroughs ended up at the sidewalk between the basketball game and Burroughs's apartment, where they argued. Burroughs yelled and cursed at Liverpool, shoved him, "grabbed at his private area," and spit on him. Lamb and Holiday, who were watching from their porch, testified that Liverpool appeared calm throughout the confrontation and kept his hands by his side.
>
> During the argument, Beck watched from the breezeway wall directly outside of Burroughs's apartment — pistol in his waistband — approximately three to five feet from Liverpool and Burroughs. After Burroughs spit on Liverpool, Liverpool stepped toward her. Beck then pulled his pistol out, came between them, and stated to Liverpool, "I wish you would." Before Liverpool could

react, Beck fired his weapon, shooting Liverpool once in his right eye. Liverpool collapsed, and Beck said to Burroughs, "I told you so, I told you so," and fled, throwing his pistol into the woods behind Burroughs's apartment building. Liverpool did not have a weapon.

At trial, Beck admitted to shooting Liverpool, but claimed that he was acting in self-defense and in defense of Burroughs. Burroughs testified that after she spit on Liverpool, she "seen him about to hit me so I closed my eyes," and then heard a shot. Beck claimed that Liverpool raised his hand and seemed to be either pulling a weapon or preparing to strike Burroughs. To support their version of events, Beck and Burroughs testified that they had known, and Burroughs had been friends with, Liverpool for several years; that they knew Liverpool by his nickname, "Killer," and believed him to be dangerous and to carry a pistol at all times; and that they believed Liverpool was out to get Beck because of an incident pertaining to a stolen truck in which Beck was involved. Beck further testified about an incident two days before the shooting that he said contributed to his fear of Liverpool: when Beck was at a bus stop picking up Burroughs's children, Liverpool — who was also there picking up children — flashed a pistol at Beck and made a threatening gesture. Beck claimed that these events led to his fear of Liverpool and prompted him to purchase the pistol that he ultimately used to kill Liverpool.

*Beck v. State*, 305 Ga. 383, 383-384 (1) (825 SE2d 184) (2019).

1. Beck argues that he is entitled to a new trial because jurors considered extrajudicial information regarding punishment to reach their verdicts. We disagree.

4

Our previous opinion summarized the juror testimony pertinent to the juror issue:

> At the motion for new trial hearing, eleven of the twelve jurors testified regarding this issue. [The twelfth juror could not attend the motion for new trial hearing because of medical reasons.] Three jurors, C. C., A. J., and M. H., testified that the jury discussed sentencing during deliberations. C. C. and M. H. testified that the sentencing discussions did not affect their verdicts, but A. J. gave inconsistent testimony on this point. Moreover, when C. C. was asked by defense counsel whether the sentencing information came from other jurors, she responded: "No. No. It was given to us and I don't know, I don't remember who. It was, I don't know whether, I don't know. We, it, nobody brought it, like brought it to court to say hey look what I found. No. But, I cannot remember how that was done. I don't remember." The eight other jurors testified that they did not consider sentencing during deliberations.

*Beck*, 305 Ga. at 385 (2).

OCGA § 24-6-606 (b) ("Rule 606 (b)") provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify by affidavit or otherwise nor shall a juror's statements be received in evidence as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the jury deliberations or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith; provided, however, that a juror may testify on the

5

question of whether extraneous prejudicial information was improperly brought to the juror's attention, whether any outside influence was improperly brought to bear upon any juror, or whether there was a mistake in entering the verdict onto the verdict form.

Rule 606 (b) became effective along with the rest of our Evidence Code in 2013. See Ga. L. 2011, p. 99, § 101. It is borrowed from the Federal Rules of Evidence, so we are guided by decisions of the federal appeals courts, especially the Eleventh Circuit, in construing and applying it. See *Beck*, 305 Ga. at 385-386 (2). The rule "imposes a nearly categorical bar on juror testimony." *Collins v. State*, 308 Ga. 608, 611 (2) (842 SE2d 811) (2020) (citation and punctuation omitted). Although "a juror may testify to any facts bearing upon the question of the existence of any extraneous influence," the court may not inquire into "the subjective effect of such information on the particular jurors." *Beck*, 305 Ga. 387 (2) (citations and punctuation omitted). "Information is deemed extraneous if it derives from a source external to the jury." Id. (citations and punctuation omitted). We review a trial court's decision that juror testimony is inadmissible for an abuse of discretion. See *Collins*, 308 Ga. at 611-

6

612 (2).

In its initial order denying the motion for new trial, the trial court relied expressly on C. C.'s and M. H.'s testimony that the sentencing discussions did not affect their verdicts and also on its finding that A. J.'s testimony about sentencing discussions affecting her verdict was not credible. See *Beck*, 305 Ga. at 385 (2). In our March 2019 decision disposing of Beck's earlier appeal, we noted that the parties had not briefed the meaning of the new Rule 606 (b) before the trial court or on appeal and that the trial court had not applied the new rule in addressing the jury misconduct issue. See id. at 386 (2). In particular, we noted that "although the trial court determined that Juror A. J.'s testimony was not credible, it made no finding about Juror C. C.'s credibility and made no finding as to whether 'extraneous prejudicial information' was, in fact, brought before the jurors." Id. at 386-387 (2). Instead of following the guidelines set forth in Rule 606 (b), we noted, the trial court relied on juror testimony about internal jury deliberations — which generally is barred by Rule 606 (b) and may not be used in

7

determining whether extraneous information is prejudicial — to conclude that even if extraneous information came before the jury, it was not prejudicial. See id. at 387 (2). We remanded the case so that the trial court could apply the correct rule. See id.

On remand, the trial court found that any testimony suggesting that any juror discussed sentencing during deliberations was not credible. The trial court concluded that "no external information regarding sentencing was provided to the jury by any outside source during deliberations" and that "the substance of [C. C.]'s subjective impressions regarding the remainder of her deliberations, including any sentence to be imposed, falls within the prohibited inquiry of OCGA § 24-6-606 (b)." The court also found that even assuming A. J. had attempted to engage other jurors in discussions regarding sentencing, any such attempted discussions were not shown to be the result of any juror's independent research of the law or gathering of evidence, and there was no discussion about sentencing between a juror and non-juror. The court concluded that any discussion of sentencing "involved an 'internal'

matter which is included in the general body of experiences that jurors are understood to bring with them to the jury room" and thus "the substance of the jury's deliberations and their subjective impressions, if any, of any sentence to be imposed falls within the prohibited inquiry of Rule 606 (b)."

On this record, the trial court was entitled to conclude that any testimony suggesting that the jury received information about sentencing from an outside source was not credible. Although Beck points to the testimony of Juror C. C. that information about possible sentences "was given to us," she also testified that "nobody . . . brought it to court" and that she could not remember specifically what had happened. And although Beck argues that M. H. and A. J. corroborated C. C., they testified, at most, that the jury discussed possible sentences, not that the jury received information about sentencing from an outside source. The trial court did not abuse its discretion in deciding that Rule 606 (b) forbade the use of the jurors' testimony about their deliberations to impeach their verdict. See *Smith v. Nagy*, 962 F3d 192, 200-204 (6th Cir. 2020) (absent

9

colorable allegation that information came from some outside source, not unreasonable for appellate court of state with rule similar to Federal Rule of Evidence 606 (b) to conclude that jurors' alleged belief that the defendant would receive a relatively light sentence for felony murder was not extraneous, but the sort of preconceived notion that jurors bring with them to deliberations). Compare *United States v. Martinez,* 14 F3d 543, 547-552 (11th Cir. 1994) (reversing defendant's convictions given evidence that jury discussed news story with information on sentence that defendant might receive if convicted, used a dictionary to define terms that arose during deliberations, watched news accounts of the trial on television, and regularly brought newspapers reporting trial events into the jury room).

2.    Beck next argues that the trial court erred by denying his request for a jury instruction on voluntary manslaughter. We disagree because there was no evidence to support such an instruction.

Beck made a written request for a charge on voluntary

10

manslaughter, and he objected to the court's failure to include that charge in its instructions to the jury, preserving the issue for ordinary appellate review. See OCGA § 17-8-58. "If there is any evidence, however slight, to support a properly requested charge of voluntary manslaughter, then the trial court must give it." *Hudson v. State*, 308 Ga. 443, 445 (2) (a) (841 SE2d 696) (2020) (citation and punctuation omitted). But a charge on voluntary manslaughter is warranted only where it can be shown that the accused "was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself." *Tarpley v. State*, 298 Ga. 442, 445 (3) (a) (782 SE2d 642) (2016) (citation and punctuation omitted). "A charge on voluntary manslaughter is not available to a defendant whose own statement unequivocally shows that he was not angered or impassioned when a killing occurred, and when the other evidence does not show otherwise." Id. (citation and punctuation omitted).

Beck testified that Liverpool had threatened him days prior to the shooting, and that he believed Liverpool was about to shoot or

11

strike Burroughs just before Beck shot him. Beck also testified that he knew Liverpool to carry a gun. But "neither fear that someone is going to pull a gun nor fighting are the types of provocation which demand a voluntary manslaughter charge." *Smith v. State*, 296 Ga. 731, 737 (3) (770 SE2d 610) (2015). And Beck testified that he was "just scared" and acting in defense of Burroughs, himself, and Burroughs's family when he shot Liverpool. Therefore, the trial court did not err in refusing to charge on voluntary manslaughter. See *Tarpley*, 298 Ga. at 445 (3) (a) (trial court correctly denied request for voluntary manslaughter instruction where defendant's statements and testimony did "not indicate that he killed [the victim] out of some irresistible passion — whatever the source of that passion — but, instead, that the killing occurred because [the defendant] was 'very afraid' of [the victim] that night"); *Smith*, 296 Ga. at 737-738 (3) (no error in refusing to give voluntary manslaughter instruction where evidence showed that shooting was prompted by altercation involving defendant's relatives 30 to 40 minutes before defendant arrived at the scene, and there was "no

evidence that following his arrival appellant was taunted by the victim or subjected to any conduct that would excite the passions of a reasonable person").

3. Beck also argues that the trial court erred by denying his request to admit specific instances of violent conduct by Liverpool, evidence about Liverpool's reputation, and evidence that Liverpool had violence-themed tattoos. We conclude that any error was harmless.

Prior to trial, Beck filed a notice of intent to present evidence of various past acts of Liverpool, that he had a reputation for carrying a firearm, and that his nickname was "Killer." Trial counsel also proffered that Liverpool had "tattoos of no mercy" and "a tattoo of a gun or some other type of symbol, brandishing sort of how he carried himself." Following jury selection, the trial court ruled that the defense could not introduce prior acts of violence of Liverpool (except any involving violence against Beck); instead, the defense could introduce only evidence as to Liverpool's general reputation for violence. The court also ruled that the defense could not

13

introduce evidence about Liverpool's tattoos unless the tattoos were visible at the time that he was killed.

Under OCGA § 24-4-404 (a) (2), a defendant is permitted to introduce evidence of a "pertinent trait of character" of the alleged victim.

> However, under OCGA § 24-4-405 ("Rule 405"), such character traits generally may be proved only with "testimony as to reputation or testimony in the form of an opinion[,]" OCGA § 24-4-405 (a), although Rule 405 (b) provides an exception to this rule: a character trait may be proved by specific instances of the person's conduct when the character trait "is an essential element of a charge, claim, or defense or when an accused testifies to his or her own character," OCGA § 24-4-405 (b).

*Strong v. State*, 309 Ga. 295, 313 (3) (845 SE2d 653) (2020) (punctuation omitted). A victim's violent character is *pertinent* to, but not an *essential element* of, a defendant's claim of self-defense, so it generally may be proven only by reputation and opinion testimony. See id. at 313-314 (3).[3] And "[a]lthough this Court has not

---

[3] Beck relies on a prior decision in which this Court held that a defendant claiming justification could introduce evidence of specific acts of violence by the victim against third persons. See *Chandler v. State*, 261 Ga. 402, 407 (3) (b) (405 SE2d 669) (1991). But we since have held that this holding was abrogated

14

yet decided whether, under the current Evidence Code, a victim's specific acts of violence of which the defendant had personal knowledge may be admissible to show the defendant's state of mind with respect to a claim of self-defense," something that federal courts have allowed, id. at 314 (3) n.22, this case does not call on us to decide that issue.

Here, Beck provided notice of his intent to introduce two prior convictions of Liverpool, a conviction for carrying a firearm without a license and some other unspecified conviction apparently related to selling drugs. Beck's counsel proffered to the trial court that Beck communicated with Liverpool while Liverpool was incarcerated, suggesting that Beck was aware of those convictions. But Beck makes no particular argument that either of these convictions show "specific acts of violence" within the meaning of the federal case law. And even assuming that the firearm possession conviction could

_____

by the current Evidence Code. See *Mohamud v. State*, 297 Ga. 532, 536 (3) (773 SE2d 755) (2015).

15

constitute evidence of an act of violence,[4] that evidence, along with any other evidence about Liverpool's violent character that Beck was precluded from introducing, was cumulative of the evidence about Liverpool that was introduced. As recounted above, the jury heard evidence that Liverpool went by the name "Killer" and had a reputation for being dangerous and carrying a firearm, as well as evidence of a prior incident at a bus stop two days before the shooting in which Liverpool flashed a pistol at Beck and made a threatening gesture. Moreover, Burroughs testified without objection that Liverpool had a tattoo that said "no mercy." And both Beck and Burroughs testified to their belief that Liverpool was looking to harm Beck based on an incident in which Beck was accused of stealing a truck. Thus, any error by the trial court in limiting evidence about Liverpool's allegedly violent character was harmless, as it is highly probable that any such error did not contribute to the verdicts. See *Strong*, 309 Ga. at 316 (4) (trial court's

---

[4] The circumstances that led to this conviction are not apparent from the record.

16

non-constitutional error requires reversal of convictions "unless [the error] can be deemed harmless, meaning that it is highly probable that the error did not contribute to the verdict" (citation and punctuation omitted)); OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . .").[5]

*Judgment affirmed. Melton, C. J., Nahmias, P. J., and Boggs, Bethel, Ellington, and McMillian, JJ., concur. Warren, J., not participating.*

Decided December 7, 2020.

Murder. Clayton Superior Court. Before Judge Collier, Senior Judge.

*Derek M. Wright*, for appellant.

*Tasha M. Mosley, District Attorney, Karen S. Barbour, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.

---

[5] Beck argues that the cumulative effect of the trial court's alleged errors denied him a fair trial. See *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020). But there are not multiple errors to consider cumulatively.

17