319 Ga. 670
FINAL COPY

S24A0687, S24X0643. POPPELL et al. v. CARDINAL HEALTH, INC. et al.; and vice versa.

MCMILLIAN, Justice.

The family members of individual drug abusers brought this action against several wholesale distributors of prescription medications, alleging that they distributed controlled substances in violation of state and federal law, resulting in the family members' injuries by the drug abusers. In Case No. S24A0687, the family members (hereinafter "Appellants") appeal from the final judgment entered on the jury's verdict in favor of the distributors (hereinafter "Appellees"), arguing that the trial court committed reversible error in denying Appellants' motion for new trial, which contended that a juror was dishonest during the selection process and introduced extraneous prejudicial information during deliberations, and that the trial court erred in refusing to instruct the jury on willful blindness. In Case No. S24X0643, the distributors cross-appeal,

arguing that in the event this Court vacates the judgment in the main appeal, the Court should determine that Georgia's Drug Dealer Liability Act, OCGA § 51-1-46 ("DDLA"), is unconstitutional in that it violates due process by imposing liability without requiring any transactional nexus between a defendant's conduct and a plaintiff's injury;[1] that Appellees are "licensed practitioners" exempt from liability under the DDLA; that Appellants' allegations of regulatory violations cannot support a DDLA claim; and the physical-impact rule bars most of Appellants' claims. In Case No. S24A0687, we reject Appellants' enumerations of error and therefore affirm. Our holding makes it unnecessary to address the distributors' cross-appeal, so we dismiss Case No. S24X0643 as moot. See *Rockdale County v. U.S. Enterprises, Inc.*, 312 Ga. 752, 753 (865 SE2d 135) (2021).

---

[1] This Court has exclusive jurisdiction over all cases in which the constitutionality of a law has been drawn into question, even if the question is raised in a cross-appeal. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II; *State v. Mondor*, 306 Ga. 338, 339 n.2 (830 SE2d 206) (2019) (recognizing that when the Court has subject matter jurisdiction over a cross-appeal, the Court has jurisdiction "over the whole case" (punctuation omitted)).

Appellants are 21 individuals who are the spouses, parents, siblings, and/or children of individual drug abusers in and around Glynn County whose drug addictions allegedly caused emotional neglect and abuse that injured Appellants. Appellees are DEA-registered, state-licensed wholesale distributors of prescription medications, including controlled substances, who supplied those drugs to pharmacies. In their complaint, Appellants alleged violations of the DDLA (OCGA § 51-1-46) and the Georgia Racketeer Influenced and Corrupt Organizations Act (OCGA § 16-14-1 et seq.), and negligence and breach of duty by Appellees and certain pharmacies.[2] Generally, Appellants' DDLA claims alleged that the drug abusers who injured them became addicted to prescription opioids as a result of Appellees' failure to report suspicious orders of controlled substances to pharmacies in the Glynn County area or to halt shipments of those orders.

A jury trial was held between January 23 and March 1, 2023.

---

[2] Before trial, Appellants dismissed their breach of duty claims and the pharmacy defendants settled, and during trial, Appellants dismissed their negligence claims.

At trial, Appellants argued and attempted to show that Appellees distributed controlled substances in violation of state and federal law to pharmacies who used those drugs to fill thousands of invalid prescriptions from "pill mill" doctors. Based on the evidence at trial, Appellants argued that Appellees had an unspoken understanding with those pharmacies to make money by supplying the controlled substances to fill those prescriptions, resulting in their use by individual drug abusers who injured Appellants in the course of their drug abuse. According to Appellants, the evidence proved that Appellees violated state and federal law by failing in their duties to maintain effective controls against the diversion of the controlled substances they distributed; by failing to conduct adequate due diligence on their pharmacy customers; and by failing to identify, report, and halt suspicious orders of controlled substances to those pharmacies, including shipments to the pharmacies that dispensed the controlled substances actually used by the individual drug abusers who injured Appellants, deliberately ignoring numerous red flags in order to continue shipping the suspicious orders.

4

Appellees, however, argued that the evidence showed that they had created and maintained compliance and due diligence programs to guard against diversion of controlled substances and that they followed the directives from federal and state regulators about tracking and reporting suspicious pharmacy orders. At the close of Appellants' case, Appellees moved for a directed verdict on the grounds that the DDLA violates due process, that Appellees are "licensed practitioner[s]" the DDLA expressly exempts from liability, that the alleged regulatory violations do not support DDLA claims, and that the physical-impact rule barred the claims of most Appellants. The trial court summarily denied Appellees' motion, and the case was submitted to the jury.

On March 1, 2023, the jury returned a verdict that none of the remaining defendants were liable as to any of the plaintiffs' claims. These appeals followed.

1. Appellants' primary contentions concern whether a new trial should be granted based on allegations that one of the jurors (Juror S. T.) introduced extraneous prejudicial information into jury

deliberations or was dishonest during jury selection.

According to the representations in Appellants' pleadings both here and below, about a week after the verdict was rendered, the jury foreperson contacted Appellants' counsel to inform counsel of alleged misconduct by Juror S. T. and provided an affidavit describing the alleged misconduct. The foreperson's affidavit, executed six days after entry of the final judgment, averred that during jury deliberations Juror S. T. told the jury that he knew individual drug abuser Ethan Tindall, who testified at trial, as well as Tindall's family; that Juror S. T. "suggested" that he had engaged in criminal activity with Tindall and his brother; that Juror S. T. had been a bad person; that Juror S. T. said that the Tindalls are bad people and that Tindall was still engaging in criminal activity; and that Juror S. T. suggested that God had put him on the jury to prevent people like Tindall's family from recovering from this lawsuit.

Appellants moved for a new trial based on the grounds that Juror S. T. had introduced extraneous prejudicial information

during deliberations and that Juror S. T. had not been truthful during voir dire regarding his knowledge of and relationship with Tindall.[3] In support of their claims, Appellants submitted affidavits from the foreperson and an associate of S. T. named M. B. M. B. averred that S. T. had discussed the trial with him and that M. B. "understood" that S. T. knew Scott and Brandy Turner, who were parties to the case.

Appellees submitted the affidavits of Jurors S. T., D. F., and B. D. in opposition to the motion for new trial. Jurors D. F. and B. D.

---

[3] Juror S. T. answered "no" to the following questions on the jury questionnaire:

> 25. Have you, or any of your close friends or family members . . . struggled with issues of substance abuse?
> 26. Do you know anyone who has been involved with or addicted to illegal or street drugs (heroin, meth, cocaine, etc.)?
> 27. Do you know anyone who has been addicted to prescription drugs (pain pills, muscle relaxers, sleeping pills, etc.)?
> 28. Have you heard about, read about, or watched programs about the opioid crisis in our nation?
> 29. Do you, for any reason, have knowledge or experience with any drugs classified as prescription opioids (e.g. oxycodone, hydrocodone, morphine, methadone, tramadol, fentanyl)?

Appellants also asserted that S. T. untruthfully answered the question "Is there anything else that you would like to tell the Court and the parties in this case? If so, please tell us here[.]" by answering "All I do is work an[d] go home." And Appellants contended that S. T. did not disclose when asked at voir dire that he knew any of the parties or individual drug abusers, including Ethan Tindall.

7

both averred that they had "no recollection" of S. T. making the statements attributed to him by the foreperson. S. T. averred that he does not know Tindall, the Turners, or their families and that he did not "recall hearing the names of any of the [individual drug abusers] or Plaintiffs before trial." He specifically denied making the statements about Tindall that the foreperson attributed to him. He did not address the assertions about his conversation with M. B. or other alleged statements about his purpose for serving on the jury.

The trial court held a hearing on Appellants' motion for new trial on June 27, 2023, where the court sought to determine whether it needed to hear from witnesses and if so, from whom. The trial court announced that it could determine whether "extraneous information . . . [had been] brought in by the affidavits . . . without any questioning of any witnesses" and that it would only hear from S. T. regarding the allegations of dishonesty, stating: "All I'm interested in is the voir dire process and questionnaire process and whether he was truthful in that process. And I'll ask the questions and it will be short." The court then scheduled another hearing for

July 21, 2023, where it called S. T. to testify.

Prior to the July hearing, Appellants submitted multiple proposed questions for the trial court to ask S. T., as well as multiple exhibits to support their contention that S. T. had misrepresented during voir dire that he did not know anyone suffering from drug addiction. These exhibits included a verified counterclaim from S. T.'s divorce proceeding in which his ex-wife stated that he had a "habitual drug addiction." Appellants also provided other criminal and court records, which they argued showed that M. B. and another individual named K. B. were both people S. T. knew well and that M. B. and K. B. had drug problems.

At the July hearing, S. T. testified that in filling out the questionnaire, he had done his best to "be as truthful as I remembered it"; that neither he nor any of his family members had ever struggled with substance abuse; and that although he learned "through this case" that some people he knew struggled with substance abuse, "[a]t the time" of the jury selection process, "I didn't really know nobody that was, you know, addicted." He flatly

9

denied knowing Tindall or the Turners and testified further that he did not introduce extraneous information about Tindall during deliberations. S. T. admitted discussing the trial with M. B. but said that the conversation occurred after the trial was over. He testified that, in his role as a juror, he decided the case based on the evidence presented at trial and the law given by the trial court. A few days after the hearing, the trial court entered its order stating that "[t]he court has reviewed the motion and heard arguments regarding the same on June 27, 2023 and on July 21, 2023. After careful consideration and review, it is hereby ORDERED that the Plaintiffs' motion for new trial be DENIED."

(a)    Appellants contend that Juror S. T.'s introduction of extraneous prejudicial information into jury deliberations deprives them of their right to a fair and impartial jury and requires a new trial. More specifically, they argue that by suggesting to the jury during deliberations that Tindall continued to be engaged in criminal activity, S. T. was telling the jury that Tindall had lied to them on the stand when he claimed otherwise and that this was

10

extraneous prejudicial information.

"A motion for new trial because of improper juror conduct is addressed to the sound discretion of the trial judge, and unless there is an abuse of discretion, an appellate court will not upset the trial court's determination." *Dorsey v. State*, 279 Ga. 534, 544 (5) (615 SE2d 512) (2005); see also *Collins v. State*, 308 Ga. 608, 611-12 (2) (842 SE2d 811) (2020); *Armstrong v. Gynecology & Obstetrics of DeKalb, P.C.*, 327 Ga. App. 737, 740 (1) (761 SE2d 133) (2014) (noting that "the new Evidence Code does not change [this] long-standing rule"). "[I]f [a] trial court determines that extraneous information was provided to the jury, it will have to evaluate prejudice." *Beck v. State*, 305 Ga. 383, 387 (2) (825 SE2d 184) (2019). As pointed out by both parties, OCGA § 24-6-606 (b) is the evidentiary rule that limits the kind of evidence that may be admitted from a juror after verdict when there is a challenge to the validity of the verdict:

> Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify by affidavit or otherwise nor shall a juror's statements be received in

11

evidence as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the jury deliberations or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith; provided, however, that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the juror's attention, whether any outside influence was improperly brought to bear upon any juror, or whether there was a mistake in entering the verdict onto the verdict form.

OCGA § 24-6-606 (b) ("Rule 606 (b)"). See *Ford Motor Co. v. Conley*, 294 Ga. 530, 550 (3) (b) n.13 (757 SE2d 20) (2014) ("The statutory limitation on questioning jurors after their verdict is now found in OCGA § 24-6-606 (b)."); see also *Harris v. State*, 314 Ga. 51, 54-55 (2) (875 SE2d 649) (2022) ("Rule 606 (b) governs what is or is not admissible to sustain or impeach a verdict, creating a nearly categorical bar on juror testimony, with only three specific exceptions." (citation and punctuation omitted)); *Beck v. State*, 310 Ga. 491, 495 (1) (852 SE2d 535) (2020) ("Although a juror may testify to any facts bearing upon the question of the existence of any extraneous influence, the court may not inquire into the subjective

effect of such information on the particular jurors." (citation and punctuation omitted)).

Citing Rule 606 (b), Appellees first argue that the foreperson's affidavit testimony about S. T.'s alleged statements during deliberations was inadmissible to the extent that it did not concern whether extraneous prejudicial information was improperly brought to the jury's attention. We agree. Under Rule 606 (b), evidence about S. T.'s statements made in deliberations concerning his own mind or emotions or mental processes during deliberations—evidence such as the foreperson's averments that S. T. stated he was a bad person and did bad things and perceived a divine purpose in serving on the jury—was inadmissible, and we do not consider it. See OCGA § 24-6-606 (b).

Thus, in our analysis, we will only consider evidence of potentially extraneous information that was allegedly introduced by S. T. during deliberations. As averred by the foreperson, these statements include that S. T. knew Tindall and "suggested" he had engaged in criminal activity with Tindall and "suggested" that

13

Tindall was still engaged in criminal activity. However, S. T. testified that he did not know Tindall and specifically denied making the allegedly prejudicial extraneous statements about Tindall that the foreperson attributed to him, and Jurors D. F. and B. D. both averred that they had "no recollection" of S. T. making such statements.

Although the trial court denied the motion for new trial without making express factual findings or determinations on credibility, we have held that "[i]t is well settled that a trial court is not required to issue written findings of fact and conclusions of law when deciding a motion for new trial." *Lynn v. State*, 310 Ga. 608, 611 (2) (852 SE2d 843) (2020). In such cases involving a summary denial of a motion for new trial, we have also held that "in the absence of explicit factual and credibility findings by the trial court, we presume implicit findings were made supporting the trial court's decision." *Anthony v. State*, 311 Ga. 293, 297 (3) (857 SE2d 682) (2021) (citation and punctuation omitted). See also *State v. Walden*, 311 Ga. 389, 390 (858 SE2d 42) (2021) ("Where, as here, the trial

14

court was not required to make explicit factual findings or credibility determinations on the record, and in fact did not do so, we assume that the trial court implicitly resolved *all* disputes of fact and credibility in favor of its ruling, and we generally accept such implicit factual findings unless clearly erroneous." (emphasis added)); *Cain v. State*, 306 Ga. 434, 438 (2) (831 SE2d 788) (2019) (assuming that trial court credited testimony of officers over defendant where trial court ruled that defendant's statement was voluntary without making explicit factual findings); *Dallow v. Dallow*, 299 Ga. 762, 777 (4) (791 SE2d 20) (2016) (recognizing that "[i]n the absence of a contrary showing, the trial court will be presumed to have followed the law" (citation and punctuation omitted)).

Because the trial court was authorized to credit S. T.'s live testimony over the testimony provided by the foreperson by affidavit, and was likewise authorized to give more weight to the affidavit testimony of Jurors D. F. and B. D., whose averments supported S. T.'s live testimony, in concluding that no extraneous

prejudicial information was provided to the jury, we see no abuse of discretion in denying a new trial on this basis. See *Beck*, 310 Ga. at 496 (1) (affirming trial court's denial of motion for new trial based on introduction of alleged extraneous prejudicial information during jury deliberations because "[o]n this record, the trial court was entitled to conclude that any testimony suggesting that the jury received [extraneous prejudicial] information . . . was not credible"); *Burney v. State*, 309 Ga. 273, 293 (5) n.16 (845 SE2d 625) (2020) ("Because the trial court was sitting as a trier of fact in determining what transpired during jury deliberations, we defer to its resolution of this and any other conflicts or inconsistencies in the evidence presented."). This enumeration of error fails.

(b) Appellants also contend that S. T.'s dishonesty during the jury selection process requires a new trial.[4] This claim can be

---

[4] Rule 606 (b)'s limitations also apply to this claim and constrain our review of it on appeal, as explained more below. See *Warger v. Shauers*, 574 U.S. 40, 44-48 (II) (135 SCt 521, 190 LE2d 422) (2014) (holding that Federal Rule 606 (b)'s preclusion applies to claims for a new trial made on the ground that a juror lied during voir dire and prohibits the use of evidence of deliberations to show dishonesty during voir dire); see also *Beck*, 305 Ga. at

resolved on a similar basis because the record supports a trial court finding of no material dishonesty.

To obtain a new trial on the ground that a juror did not give a correct response to a question posed on voir dire or in a jury questionnaire, a party "must show that the juror failed to answer the question truthfully and that a correct response would have been a valid basis for a challenge for cause." *Sears v. State*, 270 Ga. 834, 840 (2) (514 SE2d 426) (1999). See *Gainesville Radiology Group v. Hummel*, 263 Ga. 91, 94 (428 SE2d 786) (1993) (relying on *McDonough Power Equipment Inc. v. Greenwood*, 464 U.S. 548, 556 (104 SCt 845, 78 LE2d 663) (1984), to hold that "new trials will not be granted unless the movant can demonstrate that: 'a juror failed to answer [or to answer] honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause'"). In this context the ruling

---

385-86 (2) ("Rule 606 (b) is borrowed from the Federal Rules of Evidence," and "[w]hen Georgia courts consider the meaning of provisions borrowed from the Federal Rules of Evidence, they are guided by the decisions of the federal appeals courts construing and applying the Federal Rules, especially the Eleventh Circuit." (citation and punctuation omitted)).

on the motion for new trial was committed to the sound discretion of the trial court, it was the trial court's role as the fact-finder to determine issues of credibility and resolve any inconsistencies in the admissible evidence, and "[t]he trial court's findings of fact on the question whether a juror answered a [ ] question untruthfully will be upheld unless clearly erroneous." *Jones v. State*, 289 Ga. App. 767, 771 (4) (658 SE2d 386) (2008); see also *Dorsey*, 279 Ga. at 544 (5) ("A motion for new trial because of improper juror conduct is addressed to the sound discretion of the trial judge, and unless there is an abuse of discretion, an appellate court will not upset the trial court's determination."); *Hummel*, 263 Ga. at 94. And again, where, as here, the trial court was neither required to, nor did make explicit factual and credibility findings, we presume that it implicitly resolved any and all disputes of fact and credibility in favor of its ruling, and we generally accept those implicit factual findings unless clearly erroneous. See *Walden*, 311 Ga. at 390; *Anthony*, 311 Ga. at 297 (3).

Here, while Appellants presented admissible evidence that

18

they argue supports a finding that S. T. was dishonest during the selection process, any such findings of dishonesty must be made by the finder of fact after resolving any inconsistencies, making credibility determinations, and weighing the evidence. Appellants argue that S. T. dishonestly answered "no" to questions in the jury questionnaire about whether S. T. knew of friends or family members who were drug abusers or had heard about the opioid crisis. Appellants argue that the evidence they presented—namely, S. T.'s ex-wife's assertion during their divorce proceedings that he had a "habitual drug addiction," and the records showing that M. B. and K. B., whom S. T. knew, were involved with illegal drugs— proved that S. T.'s answers to those questions were dishonest. But a lone allegation by an ex-spouse in a divorce proceeding hardly establishes proof of that allegation, all the more when denied by the accused, as is the case here. And evidence that S. T. knew people who happened to be involved with illegal drugs—even evidence indicating that he may have known those people fairly well and was friendly with them—does not constitute irrefutable proof that S. T.

19

knew about their involvement with drugs or that he was dishonest in failing to so say. To the contrary, S. T. testified at the hearing that he did not struggle with addiction and that he knew both M. B. and K. B. but was not aware of their alleged involvement with drugs; the trial court was authorized to credit that testimony.[5]

Appellants also argue that the foreperson's averment that S. T. knew Tindall and M. B.'s averment that S. T. knew the Turners, proves that S. T.'s silence during voir dire when asked whether he knew Tindall or Scott Turner was dishonest. Again, aside from the admissibility of the foreperson's averments on that point, there was contradictory testimony in the record, including S. T.'s testimony

---

[5] Appellants argued in passing in their appellate briefing, but more at oral argument, that record evidence concerning S. T.'s divorce proceedings, as well as a bankruptcy proceeding, proves that he was dishonest in failing to indicate on his questionnaire that he had ever been a plaintiff or defendant or had any involvement in a lawsuit or court case. But even if we take S. T.'s failure to make such indications as an affirmative answer that he had not done the above, S. T. also clearly stated in his questionnaire that he was "[d]ivorced" and owed "child support"; the trial court was not required to find that a lay person's failure to identify divorce or bankruptcy proceedings as lawsuits or court cases constituted dishonesty; and regardless, Appellants have not demonstrated that a different response from S. T. would have provided a valid basis for a challenge for cause. See *Sears*, 270 Ga. at 840 (2). The same goes for S. T.'s allegedly dishonest answer as to whether he had heard, read, or watched programs about the nation's opioid crisis.

20

that he did not know Tindall or the Turners, which testimony the trial court was authorized to credit.

Appellants also point to S. T.'s hearing testimony to support their claims of his dishonesty:

> [H]ow I made my decision was — this was me personally, but like, for instance, if I went down here to an alcohol beverage store and I bought an alcohol beverage and I left from here and I drunk that bottle and I got in an automobile accident and I killed that other party, so is it going to be on the distributor who distributed that bottle to that company? That's how I made my decision.

According to Appellants, this testimony proves that S. T. was dishonest during voir dire when he remained silent when the panel was asked generally if they disagreed with lawsuits brought by those injured by drug abusers against the drug distributors. But S. T.'s testimony about his mindset in deciding the case during deliberations is inadmissible under Rule 606 (b). See Rule 606 (b) ("Upon an inquiry into the validity of a verdict . . . a juror shall not testify by affidavit or otherwise nor shall a juror's statements be received in evidence as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon

21

the jury deliberations . . . or concerning the juror's mental processes in connection therewith."). Appellants otherwise point to various other portions of S. T.'s hearing testimony, which they characterize as "evasive," "implausible," and "unbelievable," but, again, it was for the trial court, as factfinder, not this Court, to make credibility determinations, resolve inconsistencies, and weigh the evidence. See *Beck*, 310 Ga. at 496 (1); *Burney*, 309 Ga. at 293 (5) n.16.

Appellants also argue on appeal why they believe S. T. was not credible and why they believe the other evidence they submitted proved that he was dishonest. Although they point to *United States v. Perkins*, 748 F2d 1519 (11th Cir. 1984), for the proposition that an appellate court can make credibility determinations to override a trial court's denial of a motion for new trial based on juror dishonesty, that is not what *Perkins* held. To the contrary, *Perkins* applied the federal clearly erroneous standard to hold that the trial court clearly erred in determining that the juror did not make an intentional misrepresentation during voir dire, reasoning that it was objectively demonstrable from the record that the juror failed to

honestly answer material questions. See *Perkins*, 748 F2d at 1529-32 (IV). That is neither inconsistent with the standard we have set forth and applied here, nor does it persuade us to reverse the trial court's credibility determinations and factual findings in this case, which are supported by evidence in the record and are therefore not clearly erroneous.

Because the trial court was authorized on this record to find that S. T. did not answer dishonestly a material question during voir dire or in the juror questionnaire, the trial court did not abuse its discretion in denying Appellants' motion for new trial on that ground. See, e.g., *Lucas v. State*, 274 Ga. 640, 647 (11) (555 SE2d 440) (2001) (appellant not entitled to new trial on the basis of juror's voir dire responses where the record did not establish dishonesty). This enumeration also fails.

(c)   Lastly, Appellants contend that at a minimum, the trial court failed to conduct an adequate inquiry into whether extraneous prejudicial information was introduced to the jury and that a remand is required for a full evidentiary hearing, including a

23

"thorough and sifting cross-examination" of S. T. We disagree.

Relying on a series of federal criminal cases for the principle that a failure to hold a hearing on allegations of outside influences on the jury is an abuse of discretion, see, e.g., *Remmer v. United States*, 347 U.S. 227, 229-30 (74 SCt 450, 98 LE2d 654) (1954); *United States v. Chiantese*, 582 F2d 974, 979 (5th Cir. 1978); *Richardson v. United States*, 360 F2d 366, 369 (5th Cir. 1966); *United States v. Harris*, 908 F2d 728, 733 (11th Cir. 1990), Appellants point to the trial court's statement at the first hearing on their motion for new trial that it could determine whether extraneous information had been brought in by the affidavits without questioning any witnesses and that it would only need to hear from S. T. regarding the allegations of dishonesty, arguing that this demonstrates that the trial court abused its discretion by not holding a full hearing on S. T.'s alleged introduction of extraneous information during deliberations and alleged dishonesty during the selection process.

But in reviewing the claims of alleged juror misconduct in this

case, the trial court held two hearings on Appellants' motion for new trial; examined S. T., asking approximately 50 questions—many of which Appellants proposed—which later constituted over a dozen transcript pages; received into evidence the affidavit testimony of four different jurors, as well as all the exhibits Appellants tendered in support of their motion; and heard and considered extensive written and oral arguments from the parties. Also, a review of the trial court's examination of S. T. at the second hearing on Appellants' motion shows that the court asked S. T. about his responses during the jury selection process that he did not know any of the parties or individual drug abusers in this case; that the court asked about whether he knew Tindall—the subject of Appellants' extraneous prejudicial information claim; and that the court specifically asked S. T., "[d]uring the trial, did you introduce any elements that you learned outside the jury room and outside this courtroom to the other jurors?" The trial court also heard Appellants argue at length, both before and after the court questioned S. T., about the various exhibits they submitted to the court and how

Appellants believed that each piece of this documentary evidence impeached S. T.'s credibility and demonstrated both that he was dishonest during the selection process and that he introduced extraneous prejudicial information during deliberations.

Moreover, although Appellants claim that their right to cross-examine S. T. under OCGA § 24-6-611 (b) was curtailed, we conclude that the trial court acted within its discretion in its determination of the mode and presentation of evidence at the second hearing. OCGA § 24-6-611 (b) provides in relevant part: "The right of a thorough and sifting cross-examination shall belong to every party as to the witnesses called against the party." S. T., however, was not a witness called "against" Appellants, so it does not appear that the statutory right to a "thorough and sifting cross-examination" applies to S. T. Also, even if subsection (b) were somehow relevant here, the statutory context proceeding it, namely OCGA § 24-6-611 (a) (3), provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . [p]rotect witnesses from harassment or undue

embarrassment." As this Court has indicated, "the necessity of protecting *jurors* from post-trial harassment" was one of the reasons supporting a former statutory rule against allowing jurors to impeach their own verdict. See *Watkins v. State*, 237 Ga. 678, 684 (229 SE2d 465) (1976) (emphasis added). Here, the trial court acted well within its discretion in controlling the mode and presentation of evidence by propounding its own questions to S. T. and without permitting cross-examination by either side.

For these reasons, whatever the requirement for the inquiry is in this context, we hold that under the circumstances of this case, the court acted within its discretion in investigating the allegations of juror misconduct and that a remand for another evidentiary hearing is not required. See, e.g., *Smith v. Phillips*, 455 U.S. 209, 215-17 (II) (102 SCt 940, 71 LE2d 78) (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen," and when there are allegations of juror partiality,

27

"[s]uch determinations may properly be made at a hearing" where the court may "ascertain the impartiality of a juror by relying solely upon the testimony of the juror in question."); *United States v. Lloyd*, 661 Fed. Appx. 605, 607-08 (11th Cir. 2016) (trial court's decision to question the juror accused of misconduct but not the other jurors more extensively was an adequate investigation and therefore not an abuse of discretion); *Burney,* 309 Ga. at 292 (5) (affirming trial court's denial of motion for new trial based on juror misconduct where trial court appointed sheriff's department to conduct independent investigation and "prohibited both [parties] from conducting other investigations into the issue"). Therefore, this enumeration also fails.

2. Appellants also contend that the trial court committed reversible error in refusing their request that the jury be instructed on willful blindness.[6] We disagree.

Citing *Able v. State*, 312 Ga. App. 252 (718 SE2d 96) (2011),

---

[6] Appellants again objected, after the court instructed the jury, to the court's refusal to give the requested willful blindness charge.

Appellants requested that the trial court instruct the jury:

> The element of knowledge may be satisfied by inferences drawn from evidence that a Defendant deliberately closed its eyes to what would have otherwise been obvious to it. A finding of conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a Defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. Whether or not you draw any such inference is a matter solely within your discretion.

See id. at 261 (3) (b) (setting forth the appropriate language for a jury instruction on deliberate ignorance to prove the knowledge element of a violation of a criminal statute). But the trial court ruled, "I find that's argumentative. You can argue that to the jury, but I am not going to give the charge on it."

We need not decide whether the trial court erred in refusing to give the charge on willful blindness in this civil case—which Appellants requested based on similar language taken from criminal case law—because pretermitting that issue, Appellants have not shown that they were harmed by the trial court's refusal to give the requested charge. In civil cases, OCGA § 9-11-61 provides:

> [N]o error or defect in any ruling or order or in anything

done or omitted by the court . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

See also *Fulton Nat. Bank of Atlanta v. Marshall*, 245 Ga. 745 (267 SE2d 225) (1980) (conducting harmless-error review of refusal to give requested charge). We have described OCGA § 9-11-61 as "exhort[ing] the appellate courts to disregard errors or defects in the proceeding which do not affect the substantial rights of the parties, but leav[ing] open the question of how to determine when an error affected the parties' substantial rights or that the failure to correct the error was inconsistent with substantial justice." *Phillips v. Harmon*, 297 Ga. 386, 392 (I) (B) (774 SE2d 596) (2015) (cleaned up). "[W]hether an error requires reversal depends on the nature of the error and the importance of the issue to which it applies." Id. (citation and punctuation omitted).

Here, the trial court instructed the jury, "Plaintiffs allege that

30

the Defendants distributed or conspired to distribute certain controlled substances in violation of state and federal laws" and "Plaintiffs allege that the Defendants through an unspoken understanding, conspired with the pharmacies to make money through the distribution of controlled substances used to fill invalid prescriptions." The trial court explained that a "[c]onspiracy involves persons pursuing a common objective through a common plan," that "[t]he law recognizes the difficulty of proving a conspiracy," and thus that "it is not necessary for the persons involved in the conspiracy to . . . have entered into any explicit or formal agreement," so long as they had a "mutual understanding[.]" The court further charged:

> An understanding may be proved by circumstantial evidence. This means the understanding may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators and other circumstances. A Defendant's participation in a conspiracy may also be inferred from any acts by the Defendant which furthered the objectives of the conspiracy. In other words, the existence of a conspiracy can be inferred from the conduct of the participants.

The court instructed, "[i]f you find that any Defendant had such an

31

understanding with any of the pharmacies, then that Defendant is responsible for the conduct of all of the persons with which it had such an understanding," before charging the jury,

> [i]f you find a pharmacy or pharmacist filled a — filled prescriptions for a controlled substance that they knew or should have known were not issued for a legitimate medical purpose in the usual course of professional practice, that would constitute distribution of controlled substances in violation of Georgia law. Likewise, if you find a Defendant conspired with a pharmacy or pharmacist to supply controlled substances to fill invalid prescriptions, that would constitute distribution of controlled substances in violation of Georgia law.

Considering the charge as a whole, we conclude that the jury was accurately instructed that it could consider circumstantial evidence and make reasonable inferences from the evidence, including whether Appellees had the requisite knowledge to be held liable. See *Smith v. Stacey*, 281 Ga. 601, 604 (4) (642 SE2d 28) (2007) ("[C]onsidering the charge as a whole, it is most unlikely the jury was misled or any harm done to Appellant[s]." (citation and punctuation omitted)).

Moreover, Appellants were permitted to argue willful blindness to the jury, as well as the evidence that Appellants relied

upon in attempting to prove that theory. Appellants argued repeatedly throughout their closing that the law did not permit Appellees to "turn a blind eye to suspicious circumstances," or to "stick[ ] [their] head[s] in the sand and stuff[ ] millions of dollars in [their] pocket[s]" while ignoring "red flags." Appellants were also allowed to explain that:

> Knowledge can be inferred by sticking your head in the sand. Okay? Evidence of knowledge is shown by these distributors deliberately closing their eyes to what would have otherwise been obvious to it. You can infer that – a distributor's knowledge of a fact from a willful blindness to the existence of the fact.

See *Nalls v. State*, 304 Ga. 168, 173 (2) (a) (815 SE2d 38) (2018) (any error in jury instruction did not affect outcome of trial where court elsewhere properly instructed the jury on relevant legal issues, and appellant's theory of the case, as underscored during closing arguments, was unimpacted by alleged error); *Wright v. Wright*, 170 Ga. App. 652, 654 (2) (317 SE2d 888) (1984) (explaining that despite appellant's claim that trial court erred in refusing to give requested charge on voluntary contributions, appellant "was allowed to argue

33

voluntary contribution without limitation of use," and "[t]hus the issue raised by the appellant . . . was fairly presented to the jury").

Because the charge as a whole properly instructed the jury on knowledge and Appellants were permitted to argue willful blindness to the jury, we conclude that "the charge as a whole substantially covered the issues to be decided by the jury" and it would be "unreasonable to believe that jurors would be misled" by the court's instructions, *Lee v. Swain*, 291 Ga. 799, 800 (2) (a) (733 SE2d 726) (2012), meaning the trial court's refusal to include Appellants' requested charge on willful blindness was not "inconsistent with substantial justice," OCGA § 9-11-61, and was therefore harmless. Cf. *Mann v. State*, 307 Ga. 696, 699 (2) (a) (838 SE2d 305) (2020) (in criminal context, harmless error inquiry is whether it is "highly probable" that the failure to give a requested charge "contributed to the verdict" (citation and punctuation omitted)). Accordingly, this enumeration of error fails as well.

*Judgment affirmed in Case No. S24A0687. Appeal dismissed as moot in Case No. S24X0643. All the Justices concur, except Boggs, C. J., not participating and Peterson, P. J., and Pinson, J.,*

34

*disqualified.*

Decided September 4, 2024.

Drug Dealer Liability Act. Glynn Superior Court. Before Judge Lane.

*Bondurant Mixson & Elmore, John E. Floyd, Manoj S. Varghese, Jane D. Vincent, Jeffrey W. Chen, Solesse L. Altman; Griffin Durham Tanner & Clarkson, James D. Durham, R. Brian Tanner; Madel PA, Christopher W. Madel; The Harrison Firm, Ronald E. Harrison II; Miller & Martin, Ian K. Levy*, for Poppell et al.

*Troutman Pepper Hamilton Sanders, Harold D. Melton, W. Alex Smith, Anaid R. Kipp; Fox Rothschild, Nicholas S. Salter, John J. Haggerty; Hunter Maclean Exley & Dunn, Randall A. Jordan, Christopher Jordan; Baker & Hostetler, Stephen D. Bauer, Christopher A. Wiech, Jacqueline T. Menk; Covington & Burling, Amber Charles*, for Cardinal Health, Inc. et al.