**THIRD DIVISION
DOYLE, P. J.,
MARKLE and PADGETT, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**October 30, 2025**

# In the Court of Appeals of Georgia

A25A1173, A25A1174. WRIGHT et al v. METRO AMBULANCE SERVICES, INC. and vice versa.

DOYLE, Presiding Judge.

Following a jury verdict in favor of defendant Metro Ambulance Services, Inc. ("Metro"), plaintiffs Dr. Joray Wright, as survivor and administrator of the Estate of Vanessa Banks, and Torrie Wright (collectively "Wright") appeal in Case No. A25A1173, arguing that the trial court abused its discretion by excluding testimony of an expert witness and erred by giving or omitting certain jury instructions. Metro cross-appeals in Case No. A25A1174, arguing that the trial court erred by denying its motion for apportionment under OCGA § 51-12-33(b). For the reasons that follow, we affirm in Case No. A25A1173 and dismiss as moot Case No. A25A1174.

"[T]his Court reviews the judgment entered by the trial court after approval of a jury verdict upon the any evidence test, absent any material error of law. Additionally, when a question of law is at issue, we owe no deference to the trial court's ruling and apply a de novo standard of review." *Howland v. Wadsworth*, 324 Ga. App. 175, 176-77 (749 SE2d 762) (2013) (citations and punctuation omitted).

So viewed, the evidence showed that after the death of his mother, 63-year-old Vanessa Banks, Wright filed the instant wrongful death action against Metro on a theory of vicarious liability based on the negligence of its paramedic, Michael Kern. Testimony at trial showed that in the early morning hours of April 15, 2019, Banks was pushed from a second story window onto vegetation below. She survived the fall, and Metro's ambulance arrived at 12:33 a.m. Banks was alert and oriented at the time of transport but complained of ten out of ten pain in her left side and abdomen.

Kern and technician Chayce Burton placed Banks on a backboard and collar to protect her spine. Kern testified that he took a baseline blood oxygen level with a handheld pulse oximeter prior to leaving the scene with Banks, and based on his observations of her, he did not consider her unstable. The ambulance left the scene around 12:45 a.m., and Kern treated Banks therein, attaching a four-line cardiac

monitor and establishing an IV. Kern did not place a pulse oximeter to measure blood oxygen saturation during the trip.

About 20 minutes away from the destination hospital, Kern sought approval from a doctor to give Banks morphine. Kern reported that Banks had a history of diabetes; was conscious, alert, and oriented with a Glasgow Coma Score ("GCS") of 15; had pain in her lower lumbar and upper back; was tender on palpation; had a pulse rate of 88, normal sinus heart rhythm on the monitor, blood pressure of 150/90, and oxygen saturation of 99 percent on room air; and her breath was fast and shallow, which he scored at a 30 respiration rate. Instead of morphine, the doctor instructed Kern to administer 50 micrograms of fentanyl, which Kern gave Banks intravenously at 12:48 a.m. Kern testified the fentanyl did not reduce Banks's pain, and she was alert and speaking after he administered it. The monitor recorded Banks's heart rate approximately six times (12:42, 12:46, 12:51, 12:52, 12:56, and 1:02), and it recorded her blood pressure and mean arterial pressure three times (12:42, 12:52, and 1:02). Kern noted Banks's respiratory rate, depth, and effort over the course of the ride.

Around 1:06 a.m., Kern testified that they were about two minutes away from the hospital when Banks gasped, turned her head to the side, and became flushed and

purple. Her breathing was agonal, she had no palpable pulse, and the heart monitor indicated that she was in ventricular fibrillation ("VFIB"). Kern started cardiopulmonary resuscitation ("CPR"), and after parking the ambulance (about two minutes after CPR began), Burton came back to assist in order for Kern to attempt to defibrillate Banks. Hospital personal from the ambulance bay joined the effort to resuscitate Banks, performing bag-assisted ventilation while Kern administered intravenous amiodarone, an antiarrhythmic medication, at 1:10 a.m. Metro's crew turned care of Banks over to the hospital by 1:15 a.m. At 1:19 a.m., Banks was pronounced dead from what the medical examiner later determined to be "acute cardiac dysrhythmia complicating fall from height."

Dr. Brian Swirsky, a cardiologist, testified via video deposition that Kern was negligent for failing to continuously monitor Banks's blood oxygen saturation level, which should have been done (1) because she was a trauma patient in respiratory distress, i.e., a 30 respiratory rate; and (2) because Kern had administered fentanyl, a narcotic that Swirsky opined caused respiratory depression leading to a fatal cardiac arrhythmia (VFIB) and Banks's death. Swirsky opined that oxygen saturation is a vital sign that must be taken by a pulse oximeter, and there was no such reading recorded

4

as having been taken by Kern in Banks's patient care record. See *Se. Pain Specialists, P. C. v. Brown*, 303 Ga. 265, 266 (1) (a), n. 4 (811 SE2d 360) (2018) ("A pulse oximeter is a device that clips onto a patient's finger or toe and measures the patient's blood oxygen saturation level."). He testified that Kern could have fabricated the 99 oxygen saturation level he reported to the hospital when requesting to administer a narcotic. In anticipation of testimony otherwise, Swirsky testified that it was not possible to determine oxygen saturation simply by observing a patient breathing or based on the patient's ability to speak or interact — it must be monitored with a pulse oximeter.

In addition to the failure to monitor oxygen saturation, Dr. Swirsky opined that Kern was negligent for failing to place a 12-lead cardiac monitor rather than a 4-lead, for failing to provide supplemental oxygen given Banks's trauma-patient status, for failing to administer epinephrine before administering amiodarone, and for failing to immediately defibrillate rather than beginning CPR.

Nurse Kathleen Quick testified that Kern was negligent in several respects, including (1) failing to give oxygen to Banks because she was immobilized on a backboard and had a high respiratory rate; and (2) failing to monitor her oxygen saturation level with a pulse oximeter. Quick also opined that Kern fabricated the

5

oxygen saturation level that he reported to the physician. Given Banks's respiratory distress and Kern's administration of fentanyl, Quick testified that his failure to continuously monitor her blood oxygen saturation resulted in his missing any signs of deterioration that may have warranted other treatments prior to the onset of VFIB. She also testified that the blood pressure reading he provided to the hospital was inconsistent with any listed in the patient care report or on the heart monitor strips. She interpreted the cardiac monitor strips to show that Banks was not monitored between 1:02 a.m. and 1:08 a.m., and the onset of VFIB could have been anytime during that span. Quick also opined that Kern was negligent for a number of other reasons, and she explained that the various instances of negligence violated standards of care as well as Metro's and DeKalb County's standard protocol for ambulances as adopted from Georgia's regulations and statutes.

Burton, who drove the ambulance that night, deposed that for a patient receiving Fentanyl, protocol required he and Kern to run an IV, take vital signs, and monitor respiration and oxygen saturation. Burton admitted that even if Kern measured Banks's oxygen to get the 99 saturation level reported to the hospital, Kern did not retake it after administering Fentanyl to Banks. Burton also admitted that after

6

a patient receives a narcotic like Fentanyl, their respiration may slow until they enter VFIB — one of the reasons that continual oxygen saturation monitoring is required. But Burton also testified that it was also possible to monitor a patient by assessing their effort to breathe and ability to speak; he recalled Banks speaking with Kern in the ambulance.

Cardiologist Charles Wilmer testified on behalf of Metro that the care provided by Kern was reasonable given Banks's presentation. Dr. Wilmer opined that although having continuous blood saturation monitoring via a pulse oximeter would have been optimal, Kern's failure to so monitor Banks was not negligent because he took an initial reading of 99 percent with a handheld meter and then observed her breathing and talking during the trip.

Dr. Wilmer summarized issues that he believed could have contributed to the episode of VFIB, including Banks's diabetes and cigarette smoking, a previous injury to her heart, and having the beginnings of coronary artery disease, which together with trauma and pain from the fall, resulted in cardiac arrest and VFIB.

Dr. Wilmer also opined that the four-lead cardiac monitor of Banks was sufficient for the circumstance and that amiodarone was a better antiarrhythmic

medication than epinephrin. He also testified the cardiac monitor readings showed that Banks's first blood pressure reading was high (Wilmer explained that is expected from someone in pain), that her heart rate was good for the circumstance, and that her respiratory rate of 30 was high but also expected of someone in great pain. Dr. Wilmer then testified that

> [t]he GCS is called a Glasgow Coma Scale, and for you, who are looking and you're thinking and you can move your arms and — and breathe normally, you would be a 15, versus, say, someone who comes in comatose, can't respond and is having trouble breathing. They could drop down to a three, to a five. So she's got a normal neurologic evaluation here, with a good blood pressure, but the heart rates are up. The total 15 is upper normal, so that's normal.

Dr. Wilmer continued to discuss the interplay of hypoxia and its affect on a patient's neurologic state such that their GCS would be affected if they had low oxygenation. The following exchange then occurred:

> [Attorney]: So I want you to assume that — it's not in the medical record, but there was a portable pulse ox taken at the time of 99 percent. You've seen reference to that in the materials?
>
> [Wilmer]: Yes.

[Attorney]: Is that consistent with the Glasgow Coma Scale of 15 of Ms. Banks?

[Wilmer]: Yes. . . .

[Attorney]: We know from the evidence in this case that she wasn't having her pulse oxygenation monitored during the time period from 12:42 until the time of her arrest. As a cardiologist, any reason to believe prior to her arrest that her pulse oxygenation would have been diminished or abnormal?

[Wilmer]: Usually, if the oxygen level is dropping, you'll see a change in mental status, and you'll see a change in the blood pressure, and, you know, they'll — they'll tell you I'm feeling worse, I'm not doing well. Okay. And as long as their cognitive function is reasonable in talking to you, they're getting enough oxygen. The things you really want to watch in these — and you can't do everything — you want to watch that patient because, just like this, if they suddenly have a change, the thing you worry about the most is what happened that they suddenly have arrythmia and a sudden loss of pulse.

Second of all, if they're bleeding, you're looking for watching their airway, being sure they're not bleeding out that way, watching for blood to be coming out of the areas. There are certain areas to swell.

So these EMTs have a lot on their hands because they're looking at multiple, different facets of the patient to be sure that they're not missing anything. I think if someone's talking to you and they're alert and they're having stable vital signs, I think that that's reasonable.

9

Dr. Wilmer opined that Kern correctly started CPR rather than defibrillating Banks because "the main thing is to keep the circulation going." Dr. Wilmer also opined that Banks did not go into respiratory arrest from the fentanyl because she was alert and her vital signs were high for most of the trip, including her readings on the cardiac monitor, and any respiratory arrest from the drug would have occurred sooner. He explained that observing the components underlying the GCS provides evidence of hypoxia because most people will lose consciousness prior to having cardiac issues if they are not well oxygenated. And he was of the opinion that having a pulse oximeter measuring oxygen saturation during the ambulance ride would not have made a difference in the outcome of the case because Banks was alert most of the time. He neither believed that providing epinephrine rather than amiodarone would have changed the outcome nor that performing a defibrillation sooner would have done so.

On cross-examination, Wilmer admitted that he had not initially mentioned the GCS in his deposition, and he just started looking into it a month prior to trial. Following deliberation, the jury found in favor of Metro, and the trial court entered judgment against Wright.

1. Wright argues that the trial court abused its discretion by excluding rebuttal testimony of Dr. Swirsky after Dr. Wilmer admittedly testified about a new and undisclosed opinion regarding the GCS. We disagree.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. See *City of Milton v. Chang*, 373 Ga. App. 667, 676-77 (2) (906 SE2d 784) (2024). See also *Lee v. Smith*, 307 Ga. 815, 820-21 (2) (838 SE2d 870) (2020) (discussing discretion to control witness identification in discovery). Nevertheless, in order to reverse a trial court's allegedly wrongful decision to exclude a rebuttal expert from testifying at trial, an appellant must establish that the decision resulted in harm. See *Lee*, 308 Ga. at 822 (2); *Chang*, 373 Ga. App. at 676-77 (2). "When we consider whether an error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Chang*, 373 Ga. App. at 677 (2) (punctuation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"); *Ross-Stubblefield v. Weakland*, 359 Ga. App. 523, 527 (859 SE2d 502) (2021) .

Approximately four and a half months after the scheduling order deadline for identification of expert witnesses, Wright noticed Metro of his intent to call Dr. Swirsky first as a rebuttal expert and then in his case-in-chief. Thereafter, Metro moved in limine to limit Dr. Swirsky's testimony. In an omnibus order, the trial court applied *Lee*, 307 Ga. at 824 (3), denying the motion in limine and allowing Swirsky to testify both in the case-in-chief and on rebuttal.

Trial began, and just before opening statements and over Wright's objection, Metro invoked the rule of sequestration thereby prohibiting expert Nurse Quick from watching the testimony. Thereafter, during Metro's opening statement, Metro stated that Dr. Wilmer would testify that Kern used the GCS to gauge Banks's oxygen saturation during the ambulance ride. Wright objected to this statement as unsupported by the expected testimony, but the trial court overruled the objection.

As summarized above, Dr. Swirsky's testimony was presented via videotaped deposition during Wright's case-in-chief, but Swirsky later arrived at the courthouse near the conclusion of Wright's case. Wright renewed his motion to allow his expert (this time Dr. Swirsky) to listen to Dr. Wilmer in order to formulate rebuttal opinions to the newly argued facts regarding the use of GCS as a proxy for an oxygen saturation

reading.[1] The trial court denied this motion, prohibiting Dr. Swirsky from watching the testimony, and it also completely prohibited him from testifying on rebuttal despite its pretrial ruling allowing his rebuttal testimony. The court concluded that there was no reason for him to do so because his prerecorded rebuttal to Dr. Wilmer's expected testimony was already in evidence. After the close of Metro's case, Wright renewed his motion to allow Dr. Swirsky to testify in rebuttal, presenting him to proffer expected testimony regarding Dr. Wilmer's testimony about the GCS. At the conclusion of the proffer, during which Wright was not allowed to pose questions to Dr. Swirsky, the trial court denied the motion to allow his rebuttal testimony.

(a) As an initial matter, we disagree with Wright's contention that the trial court should have applied the *Lee v. Smith* factors when it considered his motion to allow rebuttal of Dr. Wilmer's new testimony. See *Lee*, 307 Ga. at 823-24 (3) (adopting factors that a trial court should apply prior to excluding testimony of an expert solely

___

[1] Notably, Wright did not object on the basis that this portion of Dr. Wilmer's testimony was inadmissible on the basis that it was scientifically inaccurate. See, e.g., *Johnson v. Terminal Inv. Corp.*, 374 Ga. App. 629, 635 (1) (913 SE2d 14) (2025) (explaining that "an expert 'may not render an opinion that is wholly speculative or conjectural'"); *National Emergency Med. Servs. v. Smith*, 368 Ga. App. 18, 28-29 (1)(a) (889 SE2d 162) (2023) ("OCGA § 24-7-702(b)(2) specifically requires that an expert's testimony be 'based upon sufficient facts or data[,]'" and upon "reliable principles and methods").

on the basis that the party identified them after the date set in the pre-trial order). There is no indication in the record that the court made its decision based on any late identification of a witness or for otherwise violating any of its orders.

(b) With regard to the trial court's ruling, our review of the trial testimony, the depositions, and the pre-trial record establishes that Wright cannot show harm as to the trial court's failure to allow Dr. Swirsky to testify in rebuttal to Wilmer's claims regarding the GCS. Despite the fact that this was new testimony as conceded by Dr. Wilmer and Metro, Wilmer testified that the GCS simply is a score of consciousness based on observations of a patient — observations that Kern had deposed he completed and that were contained in his patient report. In fact, Kern's first deposition refers to the GCS multiple times. Moreover, Dr. Wilmer's deposition provided largely the same underlying opinion as his trial testimony: given Banks's observable demeanor (her level of alertness and ability to speak to Kern) in conjunction with the information from the cardiac monitor, she was not in respiratory distress, and Kern's failure to continuously monitor her blood oxygen saturation with a pulse oximeter was not negligent under the circumstances.

14

Although the trial court had ruled prior to trial that Dr. Swirksy could provide rebuttal testimony, his evidentiary deposition was played for the jury during Wright's case-in-chief and it contained testimony that disputed the crux of Dr. Wilmer's argument — that observations of a patient's breathing and speech can serve as evidence that the patient is not in respiratory distress and that their blood is well oxygenated. Compare *Shumate v. Ashford*, 175 Ga. App. 736, 738 (334 SE2d 336) (1985) (holding that "plaintiff's counsel was entitled to rely on the trial court's earlier ruling that [certain] evidence would be allowed in rebuttal"). In the video, Dr. Swirsky testified that lack of continuous pulse oximetry would mask any slow onset respiratory depression, and he denied that observational data was sufficient to indicate proper oxygenation, especially after administration of a narcotic like fentanyl. Dr. Wilmer's testimony was presented in a different way at trial, and giving a title to the group of observations may have served to lend it more authority; but its core was the same testimony to which Dr. Swirsky had already responded. See *Ross-Stubblefield*, 359 Ga. App. at 528-529; *Ratliff v. CSX Transp., Inc.*, 219 Ga. App. 53, 56 (2) (464 SE2d 1) (1995) (because the testimony would have been cumulative, any error the trial court made by excluding testimony was harmless). Compare *Jordan v. Santa Fe Eng'g, Inc.*,

15

198 Ga. App. 600, 602 (1) (402 SE2d 304) (1991) (excluded testimony of medical expert offered in rebuttal was not cumulative).

Finally, Dr. Wilmer's testimony regarding the GCS related to only one aspect of the alleged negligence raised against Kern — the failure to continuously monitor Banks's blood oxygen saturation. It did not address the alleged negligence for failure to use a 12-lead monitor, to immediately supplement with oxygen, to give epinephrine prior to amiodarone, or to immediately defibrillate rather than start CPR. Additionally, despite his testimony as to its import in this case, Wilmer acknowledged on cross-examination that he continuously monitors the blood oxygen saturation of his patients after administering fentanyl because that is the proper standard of care. The more prudent course in this case would have been for the trial court to allow Dr. Swirsky to testify in rebuttal to Dr. Wilmer's theory regarding the GCS. Nevertheless, our de novo review of the full record does not evince harm as a result of the trial court's refusal to allow Swirsky's testimony. See *Chang*, 373 Ga. App. at 677 (2); *Ga. Power Co. v. Hendricks*, 130 Ga. App. 733, 734 (4) (204 SE2d 465) (1974) ("While litigants are entitled to a fair trial, they are not necessarily entitled to a *perfect* trial.") (emphasis omitted). Accordingly, this argument does not require reversal.

(c) Based on our holding in Division (1) (b), we need not address any argument regarding application of the rule of sequestration to exclude Swirsky from observing Wilmer's testimony.

2. Wright argues that the trial court erred by failing to give or by giving certain jury instructions.

"We review an allegedly erroneous jury instruction de novo." *United Obstetrics & Gynecology, P. C. v. Robinson*, 376 Ga. App. 198, 200 (1) (918 SE2d 365) (2025). Compare *Poppell v. Cardinal Health, Inc.*, 319 Ga. 670, 683 (2) (906 SE2d 389) (2024) (courts conduct a harmless error review of a trial court's refusal to give a requested charge); *Howland*, 324 Ga. App. at 182 (4) ("On appeal, we review allegedly erroneous jury instructions under the plain legal error standard. It is well established that jury instructions must be read and considered as a whole in determining whether the charge contained error." (citation and punctuation omitted)).

(a) Wright argues that the trial court erred by instructing the jury that Kern should be presumed to have provided care in an ordinarily skillful manner. Over his objection to the emphasized portion below, the trial court instructed:

> A person professing to practice as a paramedic for compensation must bring to the exercise of the profession a reasonable degree of care and

17

skill. Any injury resulting from a want of such care and skill shall be an act for which a recovery may be had. This standard, when applied to the facts and circumstances of any particular case, must be of such degree of care and skill as, under similar conditions and like surrounding circumstances, is ordinarily employed by the profession generally.

If a paramedic in the treatment and care of a patient should use that degree of care and skill ordinarily employed by that profession generally, under similar conditions and like surrounding circumstances, then the paramedic would not be negligent; therefore, there could be no finding of malpractice. If, on the other hand, the paramedic should fail to use such degree of care and skill, the paramedic would be negligent, and if injury resulted because of such failure, the paramedic would be liable for such injury as a result of malpractice.[2]

*The presumption in such cases is that the services were performed in an ordinarily skillful manner. The person claiming an injury may overcome this legal presumption by introducing evidence that the paramedic did not treat the patient in an ordinarily skillful manner. Expert testimony is usually required to overcome the presumption, and the burden is on the one claiming injury to show a lack of due care and skill by a preponderance of the evidence.*

---

[2] Wright's requested jury instructions substituted the word negligence for malpractice in this paragraph, but the trial court's instruction to the jury did not adopt those changes.

(Emphasis supplied.) See 1 Ga. Suggested Pattern Jury Instructions Vol. 1 - Civil §

62.305. Wright contends that this presumption should not have applied to Kern

because he is not a licensed professional as enumerated under OCGA § 9-11-9.1(g).

Regardless of whether OCGA § 9-1-9.1(g) normally applies to paramedics, we

discern no reversible error in giving this charge. See *Harrell v. Lusk*, 263 Ga. 895, 896

(439 SE2d 896) (1994) (explaining that OCGA § 9-1-9.1(g) applies "to those licensed

professions where the state examining board's issuance of the license is conditioned

upon an applicant's successful completion of schooling and/or training"). First,

Wright's argument that application of the presumption was improper is belied by his

own request to use portions of the same pattern jury charge at issue. Additionally,

despite Wright's argument that this was a negligence case rather than a medical

malpractice case, the allegations were based on failure to perform acts of medical

treatment that resulted in Banks's death. Cf. *Brown*, 303 Ga. at 270 (2) (concluding

"that the Court of Appeals erred in deciding that whether and how to respond to

medical data from medical devices during a medical procedure does not require

medical judgment" and therefore that charging the jury on ordinary negligence was

error). The Georgia Supreme Court has explained that "[w]hether to use certain

19

[medical] equipment at all [or] what type of equipment to use . . . in a specific case certainly are decisions which normally require the evaluation of the medical condition of a particular patient and, therefore, the application of professional knowledge, skill, and experience." *Dent v. Mem. Hosp. of Adel*, 270 Ga. 316, 318 (509 SE2d 908) (1998). Likewise, decisions whether to administer one medication over another, to supplement oxygen, or to defibrillate a patient instead of performing CPR likewise required "the application of professional knowledge, skill, and experience." See id. Accordingly, this argument is without merit.

(b) Wright also argues that the trial court erred by failing to charge the jury as to negligence per se on the basis of Kern's alleged failure to comply with certain regulations, namely Ga. Comp. R. & Regs. rr. 511-9-2-.02(ddd); 511-9-2-.07(5)(h)(5); 511-9-2-.18(1), (22), and (33) (Rules of the Georgia Department of Health on Emergency Medical Services) as adopted by DeKalb County and by Metro.[3] Again,

---

[3] In this vein, Wright also requested that the jury be instructed that "violations of company policies and procedures are illustrative of negligence, but the violation of such a rule is not negligence in and of itself. If you find that there is evidence that the Defendants violated their own internal policies and procedures, you may consider such evidence to be illustrative of their negligence."

because these procedures and protocols involved the application of professional judgment, we discern no error in the trial court's failure to give this instruction.

The specific regulations cited in the instruction are broad admonitions to comply with procedures and protocols without citing any specific action. See id.; OCGA §§ 31-11-50(b), 31-11-60.1(b), (c). First, instructions to find negligence per se based on a violation of such broad regulations, rather than a specific protocol would have been confusing. Additionally, professional judgment was required with regard to the acts in question regardless of whether a duty existed under the procedures. See, e.g., *Hubbard v. Dep't of Transp.*, 256 Ga. App. 342, 351 (3) (568 SE2d 559) (2002). And in any event, Nurse Quick testified that the various protocols and procedures Wright alleged Kern violated also constituted violations of the standard of care for paramedics. Thus, the jury could have found Kern was negligent for violating the protocols and procedures based on the jury instructions given by the trial court. Therefore, we discern no error in the failure to give this instruction.

(c) Wright argues that the trial court erred by failing to charge the jury as to tort duties arising from contracts between Metro and DeKalb County. Again, however, we discern no error because as stated above in Division (2)(b), Kern was required to use

21

professional judgment to make decisions regarding the acts as issue, regardless of whether the contracts created a duty. See, e.g., *Hubbard*, 256 Ga. App. at 351 (3). Accordingly, this argument is without merit.

3. Finally, Wright asserts that he "'is entitled to a new trial because of the cumulative effect of the trial court's errors[.]' [P]retermitting whether cumulative error applies in civil cases, it applies only to errors in the evidentiary context, and [Wright] has asserted only one evidentiary error." *Steusloff v. Finelli*, Case No. A25A1366 (5) n.13 (2025 Ga. App. LEXIS 440) (decided Oct. 3, 2025), citing *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020); *Bucklew v. Womack*, 374 Ga. App. 711, 725 (7) (913 SE2d 789) (2025). Therefore, this claim fails.

*Case No. A25A1174*

4. Metro cross-appeals, arguing that the trial court erred by denying its motion to apportion damages. Metro contends that pursuant to OCGA § 51-12-33(b) (2005), the trial court erred by denying its motion to apportion damages to non-parties because Wright initially "brought" the lawsuit against five defendants. Given our holdings in Case No. A25A1173, this issue is moot. That said, we note that after briefing was filed in this case, the Georgia Supreme Court denied the request for

certiorari of *AU Med. Ctr., Inc. v. Dale*, 373 Ga. App. 521 (908 SE2d 790) (2024). See

*AU Med. Ctr., Inc. v. Dale*, Case No. S25C0507 (decided May 6, 2025). Accordingly,

we dismiss this appeal as moot.

*Judgment affirmed in Case No. A25A1173. Case No. A25A1174 dismissed as moot.*

*Markle and Padgett, JJ., concur.*